939 F.2d 975
 291 U.S.App.D.C. 147, 15 O.S.H. Cas.(BNA) 1177,
1991 O.S.H.D. (CCH) P 29,406
 AMERICAN IRON AND STEEL INSTITUTE and Bethlehem Steel
Corporation, et al., Petitioners,
v.
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION and United
States Department of Labor, et al., Respondents,
United Steelworkers of America, AFL-CIO-CLC, et al., Intervenors,
and Consolidated Cases Nos. 79-1078, 79-1111 & 82-1135.
 Nos. 79-1054, 79-1078, 79-1111 and 82-1135.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 12, 1991.
Decided July 19, 1991.
 
 On Petitions for Review of Final Agency Action by the Occupational Safety and Health Administration.
 W. Scott Railton, with whom Christopher L. Killion and Barton C. Green were on the brief, for American Iron and Steel Institute, petitioner in No. 79-1054 and intervenor in No. 82-1135. Jerome Powell and Robert A. Emmett also entered appearances for American Iron and Steel Institute.
 Jennifer M. Porter, for Lead Industries Ass'n, petitioner in No. 79-1078 and intervenor in No. 82-1135. Robert N. Steinwurtzel and Susan J. Panzik were on the brief for Lead Industries Ass'n. John H. Hall, Edwin H. Seeger, and Carl B. Nelson, Jr. also entered appearances, for Lead Industries Ass'n.
 Edward L. Merrigan, for Institute of Scrap Recycling Industries, Inc. (successor to Nat. Ass'n of Recycling Industries, Inc.), petitioner in No. 79-1111 and intervenor in No. 82-1135.
 George H. Cohen, with whom Jeremiah A. Collins and Randy S. Rabinowitz were on the brief, for United Steelworkers of America, AFL-CIO-CLC, petitioner in No. 82-1135 and intervenor in Nos. 79-1054 and 79-1078, and International Union, UAW, intervenor in No. 79-1054. James D. English, James M. Harris, Mary Win-O'Brien, and Julia Penny Clark also entered appearances for United Steelworkers of America. John A. Fillion, M. Jay Whitman, and Claude D. Montgomery also entered appearances for Intern. Union, UAW.
 Bruce Justh, Atty., Dept. of Labor, with whom Cynthia L. Attwood, Associate Sol. for Occupational Safety and Health, Barbara Werthmann, Counsel for Appellate Litigation and John Shortall, Atty., Dept. of Labor, were on the brief, for respondents in Nos. 79-1054, 79-1078, 79-1111, and 82-1135. Joseph M. Woodward, Nancy L. Southard, Allen H. Feldman, Dennis K. Kade, and Sandra Lord, Attys., Dept. of Labor, also entered appearances for respondents.
 
 
 1
 John W. Wilmer, Jr. for intervenors Brass and Bronze Ingot Manufacturers and American Cast Metals Ass'n (formerly Cast Metals Federation) in Nos. 79-1054 and 82-1135. Robert D. Moran also entered an appearance for intervenors.
 
 
 2
 Carl F. Goodman entered an appearance for South Central Bell Telephone Co., petitioner in No. 79-1054 and intervenor in No. 82-1135.
 
 
 3
 Girardeau A. Spann and William B. Schultz entered appearances for intervenor Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO, in No. 79-1054.
 
 
 4
 Anthony J. Obadal and Steven R. Semler entered appearances for intervenor National Constructors Ass'n in No. 79-1054.
 
 
 5
 Allan J. Topol and W. Patrick Morris entered appearances for Shipbuilders Council of America, intervenor in Nos. 79-1054 and 82-1135.
 
 
 6
 Edmond J. Dilworth, Jr. and Robert V. Zener entered appearances for intervenors General Motors Corp., et al. in Nos. 79-1078 and 82-1135.
 
 
 7
 Frank M. Coates, Jr. entered an appearance for intervenor Schuylkill Metals Corp. in No. 79-1078.
 
 
 8
 Elroy H. Wolff and Linda S. Peterson entered appearances for intervenor Battery Council Intern. in No. 82-1135.
 
 
 9
 William J. Kilberg entered an appearance for intervenor ASARCO, Inc. in No. 82-1135.
 
 
 10
 Michael J. Cozzillio entered an appearance for intervenor RSR Corp. in No. 82-1135.
 
 
 11
 Bruce Hamill entered an appearance for intervenor National Paint and Coatings Ass'n in No. 82-1135.
 
 
 12
 Hugh M. Finneran entered an appearance for intervenor PPG Industries, Inc. in No. 82-1135.
 
 
 13
 James A. Debois entered an appearance for intervenor American Tel. and Tel. Co. in No. 82-1135.
 
 
 14
 Before MIKVA, Chief Judge, and WALD and SILBERMAN, Circuit Judges.
 
 
 15
 Opinion for the Court filed PER CURIAM.*
 
 PER CURIAM:
 
 16
 In United Steelworkers of America v. Marshall, 647 F.2d 1189 (D.C.Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981), this court affirmed most aspects of regulations promulgated by the Occupational Safety and Health Administration ("OSHA") governing worker exposure to airborne lead. We remanded the record to OSHA, however, for reconsideration of OSHA's findings on technological and economic feasibility for a number of industries. This proceeding presents challenges from six of those industries to OSHA's feasibility findings on remand. We affirm OSHA's conclusions in all respects, except for its finding of economic feasibility for the brass and bronze ingot industry. Because the latter finding was not based on substantial evidence and was made in violation of the notice and comment provisions of the Administrative Procedure Act, we vacate that portion of OSHA's rulemaking and remand the record to OSHA for further proceedings.
 
 I. BACKGROUND
 A. Procedural History
 
 17
 On November 14, 1978, OSHA, exercising its authority under section 6 of the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. Sec. 655 (1988), promulgated comprehensive regulations designed to protect American workers from exposure to airborne lead in the workplace. See 43 Fed.Reg. 52,952, 53,007-14 (1978) (codified as amended at 29 C.F.R. Sec. 1910.1025 (1990)). The regulations set a permissible exposure limit ("PEL") of fifty micrograms per cubic meter of air (50 ug/m[3]) averaged over an eight-hour period, see 29 C.F.R. Sec. 1910.1025(c), which employers must achieve, to the extent feasible, by a combination of engineering and work practice controls. See 29 C.F.R. Sec. 1910.1025(e)(1). The regulations also contain a number of supporting provisions, including requirements for housekeeping, air monitoring, employee education and training, recordkeeping, medical surveillance, and medical removal protection. The prior standard had imposed a limit of 200 ug/m[3] but contained no other protective requirements. See 29 C.F.R. Sec. 1910.1000, Table Z-2 (1978).
 
 
 18
 A number of industry groups, labor unions, and individual companies challenged various aspects of the new standard, leading to this court's decision in Steelworkers. The Steelworkers court affirmed OSHA's actions in most respects, including OSHA's decision to mandate a PEL of 50 ug/m[3]. See Steelworkers, 647 F.2d at 1311. However, for all but ten industries, the court concluded that OSHA had failed to carry its statutory burden of demonstrating that a 50 ug/m[3] PEL was feasible to implement. For the thirty-eight industries where feasibility had not been adequately established, the court remanded the record to OSHA for further proceedings. Pending OSHA's reconsideration, the court stayed the requirement that these industries comply with the 50 ug/m[3] PEL by engineering and work practice controls alone, but mandated that they meet the PEL "by some combination of engineering, work practice, and respirator controls." Id.
 
 
 19
 In December 1981, OSHA announced that it had found the 50 ug/m[3] PEL technologically and economically feasible for all but nine of the remand industries and stated that further investigation was required to determine whether the standard was feasible for those nine. See 46 Fed.Reg. 60,758, 60,761-62 (1981). OSHA also amended section 1910.1025(e)(1) of the lead standard in several respects. First, consistent with Steelworkers, the amendments made clear that individual employers who are unable to comply with the 50 ug/m[3] PEL may escape penalty by demonstrating that, despite a finding that the standard is feasible for the industry as a whole, they have lowered exposure levels as far as they feasibly can with engineering and work practice controls. In such cases, supplementary use of respirators is permitted. Second, OSHA amended the standard to provide that, regardless of feasibility, respirators may be used with or in place of engineering and work practice controls to achieve the 50 ug/m[3] PEL if employees are exposed to levels higher than that for thirty or fewer days each year. Employers qualifying for this exemption are still required, however, to use engineering and work practice controls to reduce exposures below 200 ug/m[3]. Finally, OSHA made clear that, in addition to the Steelworkers mandate that the remand industries achieve the 50 ug/m[3] with supplementary use of respirators, if needed, during the pendency of the remand proceedings, they also were required to comply with the preexisting PEL of 200 ug/m[3] through use of engineering and work practice controls alone during that period. See id. at 60,759-61, 60,775-76.
 
 
 20
 At OSHA's request, this court remanded the record again in March 1987 to determine the feasibility of the standard for the remaining industries. In July 1989, OSHA announced that it had found the standard feasible for eight of the nine industries. See 54 Fed.Reg. 29,142 (1989). For the ninth, non-ferrous foundries, OSHA concluded that although the 50 ug/m[3] PEL was technologically feasible for the industry, it was not economically feasible because of the severe effects it would have on the small foundry segment of the industry. See id. at 29,245-46. OSHA then moved for another remand of the record to determine whether a PEL between 50 and 200 ug/m[3] would be economically feasible for the foundry industry. This court granted the motion, and in January 1990 OSHA concluded that a PEL of 75 ug/m[3] was economically feasible for small foundries (those with fewer than twenty employees) and reaffirmed its earlier conclusion that a PEL of 50 ug/m[3] was economically feasible for large foundries (those with twenty or more employees). OSHA therefore imposed a bifurcated standard reflecting these figures on the foundry industry. See 55 Fed.Reg. 3146, 3166-67 (1990).
 
 
 21
 This proceeding presents challenges to OSHA's feasibility findings by six of the industries for which findings were made in the July 1989 and January 1990 rulemakings: leaded steelmaking, lead chemicals manufacturing, independent battery breaking, secondary copper smelting, non-ferrous foundries, and brass and bronze ingot manufacturing.B. Feasibility Determinations Under Steelworkers
 
 
 22
 Section 6(b)(5) of the OSH Act, 29 U.S.C. Sec. 655(b)(5), requires that an OSHA health standard protect workers "to the extent feasible." Steelworkers marks our path for determining both technological and economic feasibility.
 
 
 23
 To establish technological feasibility, OSHA, after consulting the "best available evidence," must prove "a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the PEL in most of its operations." Steelworkers, 647 F.2d at 1272. OSHA can meet this burden by "pointing to technology that is either already in use or has been conceived and is reasonably capable of experimental refinement and distribution within the standard's deadlines." Id.; see also American Iron & Steel Inst. v. OSHA, 577 F.2d 825, 832-35 (3d Cir.1978). For example, if "only the most technologically advanced plants in an industry have been able to achieve [the standard]--even if only in some of their operations some of the time," then the standard is considered feasible for the entire industry. Steelworkers, 647 F.2d at 1264. Because the OSH Act is a "technology-forcing" statute, OSHA can also "force industry to develop and diffuse new technology." Id.; see also Society of the Plastics Indus., Inc. v. OSHA, 509 F.2d 1301, 1309 (2d Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). In applying this standard, the Steelworkers court also noted that "[i]nsufficient proof of technological feasibility for a few isolated operations within an industry, or even OSHA's concession that respirators will be necessary in a few such operations, will not undermine" a showing that the standard is generally feasible. Steelworkers, 647 F.2d at 1272.
 
 
 24
 OSHA must demonstrate technological feasibility with substantial evidence of all determinable facts and, for "matters having no possible basis in determinable fact, must explain the relevant considerations on which it relied and its reasons for rejecting alternate views." Id. at 1253. Steelworkers made clear, however, that OSHA need not prove feasibility with "certainty," nor "even ... identify the single technological means by which it expects industry to meet the PEL." Id. at 1266. OSHA's duty, rather, is "to show that modern technology has at least conceived some industrial strategies or devices which are likely to be capable of meeting the PEL and which the industries are generally capable of adopting." Id. If OSHA makes reasonable predictions based on "credible sources of information" (e.g., data from existing plants and expert testimony), then the court should defer to OSHA's feasibility determinations. See id. at 1265. Any risk that the standard may prove to be infeasible in practice is counterbalanced by flexibility in the standard's enforcement, including the ability of firms to raise feasibility issues in enforcement proceedings. See id. at 1266, 1273; Building & Constr. Trades Dep't v. Brock, 838 F.2d 1258, 1268 (D.C.Cir.1988). See also 54 Fed.Reg. at 29,149 (describing OSHA's policies in enforcing the lead standard). Although the "test for feasibility cannot be lamely deferential, the possibility of reexamination of the question [in an enforcement proceeding], and the assurance that employers will be able to rely on respirators if OSHA's predictions ... prove too sanguine, greatly ease OSHA's preliminary burden of proving feasibility." Steelworkers, 647 F.2d at 1273.
 
 
 25
 A standard is economically feasible if the costs it imposes do not "threaten massive dislocation to, or imperil the existence of, the industry." Id. at 1265 (internal quotation marks and citations omitted); see also Industrial Union Dep't v. Hodgson, 499 F.2d 467, 478 (D.C.Cir.1974). To prove economic feasibility, "OSHA must construct a reasonable estimate of compliance costs and demonstrate a reasonable likelihood that these costs will not threaten the existence or competitive structure of an industry, even if it does portend disaster for some marginal firms." Steelworkers, 647 F.2d at 1272. As with technological feasibility, OSHA is not required to prove economic feasibility with certainty, but is required to use the best available evidence and to support its conclusions with substantial evidence. See id. at 1267.
 
 C. OSHA's General Approach
 1. Technological Feasibility
 
 26
 On remand, OSHA began its feasibility analysis for each industry by examining evidence on existing exposure patterns and controls within the industry. Four of the industries (lead chemicals, lead pigments, non-ferrous foundries, and secondary copper smelting) provided data that came close enough to meeting OSHA's exacting criteria to permit feasibility assessments "with considerable assurance." See 54 Fed.Reg. at 29,145. In general (and in particular for the industries that did not provide adequate data), OSHA used its expert judgment to evaluate the data received that did not conform to OSHA's criteria. OSHA considered evidence that exposures in one or more typical facilities had already been controlled to or below 50 ug/m[3] most of the time to be the best evidence that a 50 ug/m[3] PEL was technologically feasible for the industry as a whole. Where exposures were generally but not consistently below or near 50 u g/m[3], OSHA concluded that modest improvements or additions to existing controls would likely reduce exposure levels consistently to or below 50 ug/m[3]. See id. at 29,146; see also Steelworkers, 647 F.2d at 1264.
 
 
 27
 In most cases, OSHA used a geometric mean analysis to characterize the exposure data, believing that the geometric mean is better suited than the arithmetic mean to finding an average where exposure levels cluster around one point and have only one or a few "outliers" at higher exposures. In these situations, taking an arithmetic mean would result in an average closer to the outliers, which would not be representative of the majority of exposure levels. To determine feasibility, OSHA decided it was most important to know what level was being met most of the time (the cluster of exposure levels), and it therefore concluded that the geometric mean, which is a logarithmic average and tends to fall within the cluster, would better characterize the entire exposure level distribution. See 54 Fed.Reg. at 29,147.
 
 
 28
 Based on its analysis of exposure data and existing controls in place, OSHA then identified engineering and work practice controls that the industries could employ to reduce exposures to or below 50 ug/m[3] in operations not yet controlled to that level. Where OSHA could demonstrate an industry's ability to control the operations of highest exposure to a level near or below 50 ug/m[3], it took this as an indication that controlling the other operations likely would follow easily. See id. at 29,146. Consistent with Steelworkers, OSHA found the standard technologically feasible if a typical employer could achieve the PEL in most of its operations most of the time. See id. at 29,148-49.
 
 
 29
 OSHA claims that it did not equate an industry's or employer's ability to achieve a geometric mean of 50 ug/m[3] with the technological feasibility of the standard, but rather treated it as one important element, along with its analyses of existing controls and practices and feasible improvements to them, in determining the standard's technological feasibility. A geometric mean of 50 ug/m[3] or below indicated to OSHA that exposures below the PEL were being achieved a substantial portion of the time and that exposures consistently below that level could be achieved with modest additional efforts. Although OSHA did not deem this definitive proof of technological feasibility, it did consider it to be a reliable indicator of an employer's ability to control most operations to 50 ug/m[3] most of the time, the standard set by Steelworkers. See 54 Fed.Reg. at 29,237.
 
 
 30
 OSHA stated that the most important step plants could take in evaluating the feasibility of complying with the standard was to conduct a plant-wide industrial hygiene survey to identify specific sources of lead exposure, to determine the success of existing controls, and to identify what further controls were needed. OSHA found, however, that most employers in the remand industries had failed to conduct such surveys, and this contributed to OSHA's discounting of industry assertions that their experiences demonstrated the infeasibility of meeting a 50 ug/m[3] PEL. See id. at 29,147. Although the OSH Act is a technology-forcing statute, OSHA concluded with respect to all of the remand industries that conventional controls and practices already in use within at least some segments of the industries would be adequate to meet the standard. See id. at 29,144.
 
 2. Economic Feasibility
 
 31
 OSHA approached the question of economic feasibility by estimating the probable costs of industry compliance and comparing those costs to the industry's financial profile in order to determine the likely effect of the costs on the prices of the industry's product (if the costs were able to be passed through to customers) or on the viability of the industry (if the costs had to be absorbed). Economic feasibility was shown if the industry could either pass on the costs or absorb the costs without threatening the competitive structure of the industry. See 54 Fed.Reg. at 29,150.
 
 
 32
 Compliance cost estimates for each industry were developed by OSHA's consultant, Meridian Research, Inc., and were revised in response to comments. See id. OSHA then compared annualized compliance costs to industry sales figures to determine the percentage the industry would have to raise prices in order to maintain existing profits. See id. at 29,220. Where costs could not be passed on, OSHA compared annualized costs to annual profits to determine the impact on the industry of absorbing those costs. Qualitative information was also considered (e.g., evidence of modernization or new construction indicated future profitability of the industry). See id. at 29,150.
 
 D. Standard of Review
 
 33
 On judicial review of an OSHA standard, "[t]he determinations of the Secretary [of Labor] shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. Sec. 655(f). Our function is "not to decide what assumptions or findings we would make were we in the Secretary's position," but rather to "scrutinize the record to ensure that the Secretary has made his findings of fact on the basis of substantial evidence and has provided a reasoned explanation for his policy assumptions and conclusions." Building & Constr. Trades Dep't, 838 F.2d at 1266; see also Steelworkers, 647 F.2d at 1207. Deference to OSHA's findings and policy decisions is particularly appropriate when the regulatory action involves complex technical issues:
 
 
 34
 [W]e do not pretend to have the competence or the jurisdiction to resolve technical controversies in the record or, where the rule requires setting a numerical standard, to second-guess an agency decision that falls within a "zone of reasonableness[.]" Rather, our task is to "ensure public accountability" by requiring the agency to identify relevant factual evidence, to explain the logic and the policies underlying any legislative choice, to state candidly any assumptions on which it relies, and to present its reasons for rejecting significant contrary evidence and argument.
 
 
 35
 Id. at 1207 (citations omitted); see also Building & Constr. Trades Dep't, 838 F.2d at 1266 ("When called upon to review technical determinations on matters to which the agency lays claim to special expertise, the courts are at their most deferential.").
 
 
 36
 With these preliminaries out of the way, we now turn to OSHA's findings with respect to each industry and the charges levied by the industries against them.
 
 II. LEADED STEEL INDUSTRY
 
 37
 In its initial effort to demonstrate feasibility of the lead standard, OSHA analyzed the leaded steel industry along with approximately forty other industries under one category called "other industries." See Steelworkers, 647 F.2d at 1299-1300. Despite the uniqueness of each of the "other industries," OSHA concluded that the lead standard was feasible for all of them "[b]ecause these industries generally have very low lead exposure, [hence], any compliance activities will require very simple engineering controls." Id. at 1301 (quoting 43 Fed.Reg. 54,494 (1978)). The Steelworkers court, however, rejected OSHA's feasibility findings with respect to most of the "other industries," including the leaded steel industry, and remanded to OSHA for reconsideration and treatment on an industry-by-industry basis.[1] See id.
 
 
 38
 OSHA has now completed its task on remand of individually analyzing each industry. The leaded steel industry has renewed its challenge to OSHA's findings as to both the technological and economic feasibility of the 50 ug/m[3] PEL for the leaded steel industry.
 
 A. Technological Feasibility
 
 39
 Employees in the leaded steel industry are generally exposed to airborne lead during three phases of the production process: casting or "teeming"[2] (lead shot is added to the molten steel at very high temperatures and the molten metal is then poured or cast into molds to create the leaded steel), rolling (the leaded steel is cut into the proper dimensions and checked for defects), and surface conditioning (the surface of the leaded steel is refined and conditioned to create the finished product according to customer specifications). See 54 Fed.Reg. at 29,209. OSHA concluded that the 50 u g/m[3] PEL could be achieved in the leaded steel industry in all three of these operations by implementing readily available engineering and work practice controls.
 
 1. OSHA's Findings
 
 40
 OSHA based its feasibility analysis on raw exposure level data submitted by LTV Corporation. See id. at 29,211; Exhibit ("Ex.") 688A. The American Iron and Steel Institute ("AISI") also submitted data of ranges of exposure levels industry-wide. See Ex. 694-41 at 21. OSHA discounted the AISI data because the data were submitted in an aggregated industry-wide form and did not include critical annotations correlating the exposure levels to the types of plants and operations sampled, the nature of the engineering and work practice controls in place during sampling, and the conditions of sampling that may have caused abnormally high or low exposure levels. See 54 Fed.Reg. at 29,210-11.
 
 
 41
 OSHA determined that the LTV submission was the best available evidence because the samplings were carried out when leaded steel was actually being produced. See id. In addition, the data were not aggregated or averaged--they were individual sampling results of recent air lead monitoring, which enabled OSHA to make its own evaluation of the data. The data also included annotations describing the conditions of sampling. See id. at 29,210. OSHA determined that the LTV operations were typical in nature and in size of the equipment used for the industry and that its data thus were applicable to the industry as a whole. See id.; Hearing Transcript at 893-94.
 
 
 42
 Based on its own analysis of LTV's raw exposure data,[3] OSHA concluded that the airborne lead standard of 50 ug/m[3] was technologically feasible for the entire industry because LTV was already meeting that standard most of the time in all of its operations. See 54 Fed.Reg. at 29,212. Under Steelworkers, which requires that OSHA prove "a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the PEL in most of its operations," OSHA has met its burden by "pointing to technology that is ... already in use" by LTV. Steelworkers, 647 F.2d at 1272.
 
 
 43
 The teeming area at LTV is currently equipped with general and local ventilation systems, which capture and evacuate the volatile lead fumes. See 54 Fed.Reg. at 29,212-13. Work practice controls have also been implemented to ensure that the ventilation system is operated properly. In addition, crews are rotated and the basic teeming operation of adding lead to the molten steel is done only intermittently (only once per eight-hour shift) to minimize individual worker exposure. See id. at 29,213. As a result of these existing engineering and work practice controls, 65% of all samples taken at LTV were below 50 ug/m[3]. See id. at 29,211. Based on the LTV data, OSHA determined that the standard could be achieved in the teeming process for the industry as a whole if a limited number of additional engineering and work practice controls were implemented. See id. at 29,215. For example, OSHA recommended automating the injection of lead, enclosing and ventilating the teeming area, and improving housekeeping and work practice controls. See id. at 29,214-16.
 
 
 44
 In the rolling process, most of LTV's operations are performed by remote control from inside an enclosed and ventilated booth. However, sometimes the operator must go outside the booth to maintain or clean the equipment. OSHA found that 90% of the samples taken at LTV were below 50 ug/m[3] using existing controls such as ventilation and semi-automation. See id. at 29,211. OSHA determined that the rest of the industry could meet the 50 ug/m[3] level in the rolling process by enclosing the operators' booths, automating the milling equipment, installing local exhaust ventilation systems positioned over and alongside the milling equipment, and improving housekeeping. See id. at 29,215.
 
 
 45
 In the surface conditioning process OSHA found that 90% of the LTV samples were below 50 ug/m[3] using existing controls such as an enclosed, air-conditioned cab, and automation or semi-automation. See id. at 29,211. There are no controls used for manual surface conditioning, except for work practice controls such as rotating the employees. See id. at 29,210. OSHA recommended that the industry employ semi-automated conditioning equipment operated by remote control from enclosed and ventilated work stations, and local exhaust and ventilation systems for manual surface conditioning operations. In addition, OSHA recognized that supplemental respirators may be necessary for manual surface conditioning. See id.
 
 2. Industry Challenges
 
 46
 AISI challenges OSHA's technological findings, asserting that OSHA did not rely on the best available data and that the controls recommended by OSHA are not technologically feasible because they either are unavailable or cannot achieve the PEL.
 
 
 47
 AISI argues that the LTV data were not the best available evidence because they reflected only one producer, a producer that AISI claims is atypical for the industry because some of the samples were taken during an experimental continuous casting process, a process that results in lower exposure levels than the more widely used teeming process. However, the record makes clear that LTV's data included at most seven out of twenty-seven samples taken from an experimental continuous casting operation. The vast majority of the LTV samples were taken when lead was added to molten steel in teeming operations typical of the industry. See id. at 29,212; Ex. 688A.
 
 
 48
 AISI contends that the current industry-wide data it submitted best reflects the industry as a whole. OSHA, however, could not use AISI's data because it was aggregated (the data was submitted in the form of ranges of exposure levels from various mills, instead of individual air lead measurements), and the data did not include any annotations indicating what operations and controls correlated with the samples. See 54 Fed.Reg. at 29,210. We find that OSHA acted reasonably in rejecting the AISI data for those reasons; the annotations were critical to analyzing the data for purposes of determining what controls would be necessary to reduce air lead exposure.[4] We also find that it was reasonable for OSHA to consider LTV's exposure level data as the best available evidence on the record.[5]
 
 
 49
 AISI also asserts that the controls recommended by OSHA either cannot be installed because of the nature of the production process, or have already been implemented and have not achieved the 50 ug/m[3] PEL. However, the record belies AISI's claim: at least one producer, LTV Corporation, has already controlled lead levels to or below 50 ug/m[3] most of the time in all operations using existing engineering and work practice controls. See id. at 29,211-12. Under Steelworkers, OSHA can demonstrate the technological feasibility of the lead standard by showing that "only the most technologically advanced plants in an industry have been able to achieve [the standard]--even if only in some of their operations some of the time." Steelworkers, 647 F.2d at 1264. See also American Iron & Steel Inst. v. OSHA, 577 F.2d at 832-35. We find that OSHA has met that burden here by showing that LTV, a typical plant in the industry, has met the 50 ug/m[3] PEL most of the time in all of its operations with existing controls.
 
 B. Economic Feasibility
 1. OSHA's Findings
 
 50
 OSHA determined that a PEL of 50 ug/m[3] is economically as well as technologically feasible for the industry. OSHA based its economic feasibility finding on financial data for firms found in SIC 3312,[6] which indicated that profits of approximately $900 million were expected for the industry in 1987. See 54 Fed.Reg. at 29,218. Although the leaded steelmaking segment of the industry is experiencing difficulty, the steel industry as a whole shows signs of profitability and a willingness to withstand the losses of the leaded steelmaking operations; for example, the steel industry has entered into long-term contracts for producing leaded steel and is investing in modernization of its leaded steelmaking operations. See id. at 29,218-19. OSHA estimated the costs of the additional controls necessary to achieve the PEL, and compared the costs to the overall profit and sales levels for both teeming and continuous casting producers. Annual costs to enclose and ventilate the four teeming facilities would range from $375,604 to $622,404. See id. at 29,220. Annual costs for the one plant that uses a continuous casting process were estimated at $736,799. See id.
 
 
 51
 OSHA concluded that the industry could pass through to its customers the costs of compliance because there is no general all-purpose substitute for leaded steel. See id. at 29,221. Profit impacts at the corporate level for costs that could not be passed through were estimated to be quite small and could be absorbed by the industry. See id. Impacts at the leaded steelmaking production level within the steelmaking facility (based on information for three of the five producers) were also determined to be small, although greater than the impacts estimated for the industry as a whole.[7] See id.
 
 2. Industry Challenges
 
 52
 AISI asserts that OSHA should have compared the costs of compliance to the profits generated solely by the leaded steel production within each steel manufacturing facility rather than with the sales and profits generated by the facility as a whole, which includes both leaded and unleaded steel production. However, leaded steelmaking operations constitute only one small part of the steel manufacturing industry; for instance, leaded steel is cast in the steel manufacturing facility no more than twice per 24-hour day. See 54 Fed.Reg. at 29,221. As AISI itself stated in its brief, "exposures [in the steel manufacturing facility resulting from leaded steel production] are intermittent because leaded steel is only a small part of the steel industry's bar production and no facility produces leaded steel on a continuous basis." AISI Brief at 19. Therefore, leaded steelmaking is a small, yet integrated part of the steelmaking industry; it is not a separate entity.
 
 
 53
 Moreover, although OSHA agreed with AISI's assertion that the leaded steel operations operated at a loss in 1987, OSHA found that the steel manufacturers are absorbing losses for the leaded steel operations and are continuing to invest in that segment of the industry. See 54 Fed.Reg. at 29,221. OSHA determined that the costs of compliance would constitute only a small percentage of the leaded steelmaking segment's losses, and that the steelmaking industry would absorb the compliance costs rather than shift away from leaded steelmaking because of those costs. Therefore, OSHA concluded, and we agree, that leaded steelmaking is not a "stand alone" sector of the industry and that profit data from steelmaking production could be relied upon here to find that the steel industry could absorb those costs of compliance that it was unable to pass through to its customers. See id.
 
 C. Conclusion
 
 54
 OSHA has adequately demonstrated that the 50 ug/m[3] level can be met with engineering and work practice controls that are currently available and in use, and in fact the level has already been achieved in at least one plant most of the time in every operation. See Steelworkers, 647 F.2d at 1272. OSHA has also shown that the costs of compliance will not threaten the existence or competitive structure of the industry. Thus, OSHA has satisfied its burden of demonstrating both technological and economic feasibility under Steelworkers.
 
 III. LEAD CHEMICALS INDUSTRY
 
 55
 This court in Steelworkers found that OSHA failed to present substantial evidence to support the feasibility of the lead standard for the lead chemicals industry. See Steelworkers, 647 F.2d at 1311. On remand, OSHA was directed to perform a more individualized and detailed technological and economic feasibility analysis. OSHA performed such an analysis and concluded that a PEL of 50 ug/m[3] is both technologically and economically feasible for the lead chemicals industry. See 54 Fed.Reg. at 29,186, 29,194. That industry now challenges OSHA's findings and conclusions.
 
 A. Technological Feasibility
 
 56
 Employees in the lead chemicals industry are exposed to airborne lead during three stages of the production process: manufacturing of lead oxide, packaging of the final product, and maintenance. Each of these three phases of the production process has unique emission control problems. In particular, the packaging of lead chemical product into specialized, or "non-bulk," packages according to customer specifications (the product is manually measured into bags and drums), and the maintenance of production and control equipment, are processes burdened with airborne lead emissions that are difficult to control.
 
 1. OSHA's Findings
 
 57
 OSHA primarily relied on raw exposure level data submitted by various producers in conjunction with site visits to the producers' plants by OSHA's panel of certified industrial hygiene experts. See id. at 29,174-75. OSHA relied most heavily on Plant A's data because the data were complete, recent, and annotated to indicate the causes of high exposure levels and the job tasks performed in certain work areas during the sampling. See id. at 29,174. OSHA determined that Plant A was a typical older plant that used conventional controls. See id. Data submitted by other producers were also extensive and recent, but they were not annotated; therefore, OSHA did not rely on such data as extensively as on the Plant A data.
 
 
 58
 OSHA discounted two other data sets submitted--data submitted by the industry group, the Lead Industries Association ("LIA"), and data submitted by Plant C. OSHA disfavored the LIA data because it was aggregated industry-wide and was not annotated; it did not specify the plants, the operations within each plant, or the controls in place during the samplings. Such annotations are necessary to determine the exposure levels that are associated with particular operations and sampling conditions. Plant C's data were rejected for the same reasons. Although OSHA discounted LIA's data, it did consider LIA's comments on OSHA's data and adjusted its estimates accordingly. See id. at 29,184.
 
 
 59
 During the processing of lead oxides, lead emissions are currently controlled by enclosed dust collection systems, ventilation and exhaust systems, and housekeeping. See id. at 29,178. These existing controls reduce exposure levels to 50 ug/m[3] most of the time in most operations. See id. at 29,177, 29,188. For example, at Plant A, the geometric mean for most of the production jobs was already below 50 ug/m[3] using existing controls. See id. at 29,177. Furthermore, a total of six plants in the industry have already achieved the 50 ug/m[3] standard in almost all operations, with the possible exception of the maintenance and non-bulk packaging operations. See id. OSHA found that modest improvements in housekeeping, preventative maintenance, ventilation, and enclosing open equipment would be sufficient to bring air lead levels to below 50 ug/m[3] consistently. Therefore, OSHA concluded that for most operations, the lead chemicals industry could achieve a 50 ug/m[3] PEL with available engineering and work practice controls. See id. at 29,180.
 
 
 60
 The most difficult operations to control are the packaging and maintenance operations. The worst exposure problem in packaging is specialized packaging of the lead chemical product in paper bags and drums according to customer specified measurements. Specialized packaging requires extensive manual intervention to adjust the weight of the package to customer specifications. OSHA determined that the PEL could be achieved in packaging if more of the product could be packaged with automated or semi-automated bulk packagers.[8] Several plants have successfully converted entirely or mostly to bulk shipments or semi-bulk shipments. It is much easier to control exposure levels in bulk and semi-bulk packaging operations because of dust collection and exhaust ventilation systems attached to the automated equipment that fills the bulk packages. Automation can, however, be installed on smaller non-bulk packaging equipment to reduce emissions where bulk packaging is not feasible. The industry complains that the automated equipment cannot meet the rigid demands of customers for precisely measured quantities of lead chemical product. However, automation of packaging has been developed to a precision level of 0.25%-0.1%, and even further improvements are on the horizon. See id. at 29,183; Ex. 582-90, App. C, at 3.
 
 
 61
 Still, OSHA recognized that not all specialized packaging can be converted to automated bulk packaging. Therefore, for those packaging operations that cannot be converted to bulk packaging, OSHA recommended improving existing controls, such as enclosing and ventilating the existing packaging, weighing, and palletizing operations; isolating and enclosing other operations that are contamination sources, such as the cleaning of old drums; implementing rigorous housekeeping performed by a separate housekeeping staff; and improving work habits. See 54 Fed.Reg. at 29,183-84. These recommended controls are already available and OSHA has determined that the controls will reduce emissions. For example, as a result of ventilated booths alone, a 43% reduction in exposures is anticipated. See id. OSHA also conceded that supplemental respirator use may be required to meet the PEL in a limited number of specialized manual packaging operations.
 
 
 62
 Another difficult control problem is presented by maintenance operations, which by their very nature involve high exposure to lead emissions. However, maintenance work is intermittent, and some of the equipment that requires constant maintenance and repair work is being phased out by the industry and replaced; for example, mechanical conveyor systems are being replaced by pneumatic systems, which have fewer parts to break and fewer joints to allow leakage of the lead chemical product. Although OSHA did find that in one plant the exposure levels for maintenance workers were below 50 ug/m[3] approximately 60% of the time, and the geometric mean was 22 ug/m[3], see id. at 29,187, OSHA conceded that certain maintenance tasks cannot be controlled to 50 ug/m[3] and those tasks may require supplementary respirators. See id. at 29,185.
 
 
 63
 OSHA determined that at Plant A, a "typical" older plant with existing controls, a majority of all samples were below 50 ug/m[3] and the geometric mean exposure levels in six out of eight job classifications were below 50 ug/m[3].[9] In addition, in six other plants, exposure levels already have been or in the foreseeable future will be controlled with existing controls to 50 ug/m[3] in most operations most of the time. See id. at 29,176-77.
 
 2. Industry Challenges
 
 64
 The industry challenges OSHA's technological feasibility determination on the grounds that (1) the judgments of OSHA's panel of three certified industrial hygiene experts, as well as the data and the site visits on which the panel based its judgments, were not the best available evidence; (2) OSHA's recommendation that the industry convert to bulk packaging and/or automated packaging is not an "engineering and work practice control"; (3) OSHA's finding that maintenance operators may need supplemental respirators invalidates the feasibility finding for the entire industry; and (4) OSHA's use of the geometric mean in its feasibility analysis is unfair because OSHA does not use the geometric mean in its enforcement. We shall address each challenge in turn.
 
 
 65
 First, the industry criticizes OSHA for using the "judgment" of the panel rather than raw data; however, Steelworkers clearly permits OSHA to rely on expert judgments: reasonable predictions based on " 'credible sources of information,' whether data from existing plants or expert testimony," constitute substantial evidence in the record on which a court may uphold OSHA's findings. See Steelworkers, 647 F.2d at 1266 (quoting AFL-CIO v. Marshall, 617 F.2d 636, 657-58 (D.C.Cir.1979)). Accordingly, we find that OSHA may rely here upon the "judgment" of "experts."
 
 
 66
 The industry also challenges OSHA's reliance on data obtained on site visits. However, the industry did not offer any additional raw data accompanied by the annotations OSHA would need to determine exposure levels and the effect of additional controls on these exposure levels; instead, the industry offered only aggregated data without any annotations. Though this type of data was not useful to OSHA, OSHA did take into account the industry's comments on OSHA's own data and adjusted its analysis of that data accordingly. In any case, we reject the industry's challenges to the suitability of OSHA's data and find that in this case the judgment of the panel of experts, along with the data from several existing plants, constitutes substantial evidence supporting OSHA's technological feasibility determination.
 
 
 67
 The industry also claims that OSHA cannot require the industry to convert specialized product packaging to bulk packaging because it will cause them to lose the specialized packaging market to foreign competition. The industry contends that conversion to bulk packaging is a business marketing strategy dictated by the needs and demands of lead chemical consumers, not an engineering or work practice control, and therefore OSHA does not have authority under the OSH Act to require conversion.[10]
 
 
 68
 We are not persuaded by the industry's argument. First, OSHA's feasibility finding does not require that the industry convert entirely to bulk packaging in order to meet the lead standard, but only requires that the industry meet the standard using a combination of controls that the company selects, which may include automation of specialized packaging or improved ventilation controls on the existing specialized packaging machines. Second, even if substantial conversion proves necessary to meet the standard, the agency would be within its authority under the OSH Act to so require because, as this court made clear in Steelworkers, the OSH Act is a technology-forcing statute. See id. at 1230, 1264. The industry claims that OSHA's "innovative method" of recommending conversion to bulk packaging is not an "engineering and work practice control" within the meaning of 29 C.F.R. Sec. 1910.1025(e). Under the OSH Act and its regulations, however, "engineering controls are intended to alter industry's machines, processes, materials, or products to reduce lead exposure at its source." 43 Fed.Reg. at 52,989. See also Steelworkers, 647 F.2d at 1205 n. 12. We agree with OSHA that alterations in packaging and shipping methods fall within the definition of "engineering controls" and therefore are encompassed in the meaning of the Act.
 
 
 69
 Although OSHA does not require conversion to bulk packaging, the agency does encourage as much automation of the packaging process as possible, either by conversion to bulk packaging or by automating the smaller packaging processes. The industry claims that full automation is infeasible because of the many different sizes of packages demanded by consumers. Yet, as noted earlier, the technology is available to automate, or at least semi-automate, packaging for a variety of smaller sizes to meet customer specifications to within 0.25%-0.1% error. See 54 Fed.Reg. at 29,183; Ex. 582-90, App. C, at 3. Again, we note that OSHA does not demand full automation: OSHA concedes that some specialized packaging operations will continue to be manual and may require supplementary respirators to meet the lead standard. Switching gears, the industry asserts that OSHA's feasibility analysis is flawed by the finding that respirators may be necessary; however, as Steelworkers clearly states, "the standard can be feasible generally for an industry even where it is, either on the facts or by OSHA's concession, infeasible for certain operations within that industry." Steelworkers, 647 F.2d at 1297. Indeed, the specialized packaging operations, which require manual intervention and therefore result in high exposure levels unless supplementary respirators are used, are not "primary" operations and involve only 15% of the industry's shipments. See 54 Fed.Reg. at 29,179.
 
 
 70
 The industry also challenges OSHA's feasibility analysis on the grounds that OSHA failed to demonstrate the feasibility of meeting the 50 ug/m[3] PEL in maintenance operations without supplemental respirators. The industry claims that the need for respirators in maintenance operations invalidates the feasibility analysis for the entire industry. That assertion, however, is unfounded, as this court previously found in Steelworkers:
 
 
 71
 As for maintenance, since no one could logically expect industry to always meet the PEL for workers one of whose main tasks will be to maintain and repair the control devices designed to achieve the PEL generally, we believe that OSHA need not prove that industry will not have to rely on respirators in this operation.
 
 
 72
 Steelworkers, 647 F.2d at 1281 n. 138. Steelworkers made clear that the ability to control maintenance exposure levels, while important, will not invalidate the feasibility of controls for the industry as a whole. See id. at 1286. Thus, we find that OSHA's concession that respirators may be necessary for certain maintenance operations does not invalidate the standard where, as here, most of the operations in the industry can meet the standard with engineering and work practice controls.
 
 
 73
 Finally, the industry criticizes OSHA's use of the geometric mean to establish technological feasibility. The industry challenges OSHA's reliance on the geometric mean as unfair because the geometric mean virtually ignores outlying exposure samples, while the "point source" method of sampling during enforcement does not ignore such samples and may result in high exposure outlier samples that are not representative of the average exposure levels. OSHA found that the geometric mean was the best statistical method to summarize the routine exposure samples. Feasibility of compliance turns on whether exposure levels at or below 50 ug/m[3] can be met in most operations most of the time; therefore, it is the routine exposure levels that determine feasibility, and atypical outliers cannot invalidate a feasibility finding. As discussed earlier, an arithmetic mean provides little insight into the distribution of exposures that are lognormally distributed. Lognormally distributed exposure data can be described as a cluster of data points with a few abnormally high or low samples. If OSHA took an arithmetic average of such data, the average would be skewed higher than the cluster of samples and therefore would not reflect the majority of the exposure levels, which fall within the cluster.[11] Because the geometric mean falls within or close to the cluster of samples, it best reflects the majority of the exposure levels. See 54 Fed.Reg. at 29,177. The point source samples taken during the enforcement phase most likely will fall within the cluster of routinely sampled exposure levels; therefore, the geometric mean, which best reflects the majority of exposure levels, is a good indicator of the feasibility of compliance.
 
 
 74
 Additionally, OSHA's enforcement policy takes into account the possibility that a single measurement over 50 ug/m[3] can be due to random variability, and OSHA will not issue a citation on that basis alone. See id. at 29,149. Instead, OSHA will examine the employer's historical exposure patterns to determine whether conditions on the day of inspection were representative. See id. The employer has the opportunity to demonstrate that the "one-time" OSHA sample is not representative and to establish that it has already reduced exposures to the lowest feasible limit. Several courts, including this court in Steelworkers, have upheld feasibility determinations by OSHA while recognizing that the general feasibility of the standard may still need to be counterbalanced by flexible enforcement, including variance proceedings. See Steelworkers, 647 F.2d at 1273; Society of the Plastics Indus., 509 F.2d at 1310; Building & Constr. Trades Dep't, 838 F.2d at 1268. Thus, we do not agree with the industry's contention that the use of the geometric mean, which attempts to summarize routine exposure levels, is inherently inconsistent with the flexible enforcement policy espoused by OSHA before this court.
 
 
 75
 Neither the lead standard nor OSHA's enforcement policy ties compliance to achievement of any particular mean and Steelworkers requires nothing more than a showing of a reasonable probability that the lead standard can be met. See Steelworkers, 647 F.2d at 1272. We agree with OSHA's determination that the geometric mean is an appropriate method of determining the reasonable probability of meeting the 50 ug/m[3] PEL in most of the industry's operations. We find that OSHA has met that burden using the geometric mean of 50 ug/m[3] as an indicator of a reasonable probability of compliance.
 
 
 76
 Finally, to the extent that the industry claims that the controls recommended by OSHA will not achieve the 50 ug/m[3] PEL, or cannot be installed for technological reasons, their assertion is contradicted by the record, which shows that several plants are already meeting, or are close to meeting, the 50 ug/m[3] PEL with existing controls that are readily available to the rest of the industry. See 54 Fed.Reg. at 29,183.
 
 B. Economic Feasibility
 
 77
 The single most difficult, and most costly, operation to control in this industry is packaging. OSHA has recommended many possible controls and combinations of controls, including an increase in automated bulk packaging. However, the individual companies are not required to choose the option of conversion in order to comply with the 50 ug/m[3] PEL; under Steelworkers, OSHA merely suggests options and leaves it to the companies to decide which ones to implement. See Steelworkers, 647 F.2d at 1266. Still, for purposes of determining economic feasibility, OSHA calculated the cost of adding at least two automated packagers to each plant as part of the compliance costs. See 54 Fed.Reg. at 29,192.
 
 1. OSHA's Findings
 
 78
 OSHA based its economic feasibility analysis on data for firms in SIC 2819. See id. at 29,194. Profits were estimated using the 1986 Dun & Bradstreet rate of return on sales for SIC 2819 of 4.9%. See id. The industry's net profit after tax was $137,700 (1985) and $84,500 (1986). OSHA calculated the costs of controls for older plants at a total incremental annual cost of approximately $200,000[12] (including two melting pot ventilation systems, two packaging enclosure and ventilation systems, two automated packaging systems, and improved housekeeping). See id. at 29,193. For relatively new plants, the total incremental annual cost was estimated at $81,074 (including two enclosed ventilated packaging stations, two enclosed ventilated drossing systems, and improved housekeeping). See id. And for new or modernized plants, OSHA determined that there would be no costs for the plants packaging exclusively in bulk (three out of six plants), and for the plants packaging in bags, the total annual cost was estimated at $32,066. Aggregate industry compliance costs were estimated to be $937,000. See id.
 
 
 79
 OSHA determined that the lead chemicals industry would be able to absorb the costs of compliance in their profits. See id. The impact on profits for older plants would be greater than the impact for new plants; however, the rate of return on sales for both types of plants would still be positive after the compliance costs are absorbed.[13] In sum, OSHA determined that, with an extended compliance schedule of five years to allow for modernization and increased profits, the industry would be able to absorb the costs of compliance without threatening its existence or competitive structure. See id.; Ex. 686E at 36-38.
 
 2. Industry Challenges
 
 80
 The industry challenges only OSHA's finding that converting to automation or automated bulk packaging is economically feasible for the industry. The industry claims that complete conversion is not feasible because of customer demand for specialized packaging, which requires manual measurement, and because the cost of 100% conversion would be much greater than OSHA estimated and could not be absorbed by the industry. OSHA made clear, however, that it does not require complete conversion to automated bulk packaging. See 54 Fed.Reg. at 29,192. In fact, OSHA recommended a number of possible controls for those specialized packaging operations that cannot be automated or converted to bulk packaging, thereby recognizing that 100% conversion is not required for compliance with the lead standard.
 
 
 81
 Furthermore, the industry itself admits that chemical buyers request specialized packaging only "on an infrequent basis" and that this specialized packaging is "relatively small in terms of the total market for lead chemicals generally." LIA Brief at 25. Only 15% of the chemicals produced in the industry are specially packaged. See 54 Fed.Reg. at 29,179. Even assuming that conversion to automated bulk packaging is the only means of compliance, and that such conversion may cause a 15% drop in demand for the industry's product, still there is not sufficient evidence to challenge OSHA's determination that such a loss would not threaten the competitive structure of the industry as a whole. In the absence of such evidence, we cannot find that OSHA was incorrect in concluding, based on the best available evidence, that the lead chemicals industry can absorb the estimated costs of compliance without any threat to the industry's existence or to its competitive structure, and therefore, that the PEL of 50 ug/m[3] is economically feasible.
 
 C. Conclusion
 
 82
 In sum, we find that OSHA's conclusions are reasonable and supported by substantial evidence in the record; therefore, we affirm OSHA's findings that the 50 ug/m[3] PEL is technologically and economically feasible for the lead chemicals industry.
 
 IV. INDEPENDENT BATTERY BREAKING
 
 83
 The independent battery breaking industry extracts lead from used batteries for sale to secondary smelters. Lead is recovered by cutting or crushing industrial, automobile, and other batteries and then separating the lead compounds from the other battery materials, such as sulfuric acid, cell separators, and cell casings. See 54 Fed.Reg. at 29,162. The cutting or crushing processes release lead particles into the air, and these operations present the greatest difficulties in suppressing the airborne lead. In addition, handling of the batteries before they are broken up, and of the recovered lead itself, may also give rise to airborne emissions. See id. at 29,162-63. Among the controls used by the industry to minimize exposure to lead are wetting of the materials during all phases of the process to reduce the lead particles' tendency to become airborne; enclosure of cutting, crushing, and processing operations to limit the escape of the particles that do become airborne; and automation of all these processes to limit the presence of employees near lead sources. See id. at 29,165.
 
 
 84
 Battery breaking is conducted either by integrated industrial operations (battery breaking is often integrated into secondary lead smelters plants that use the output of the battery breakers) or by independent operators; it is the challenge of the latter group which is presented here. There is little dispute that the independent battery breaking industry is in a state of severe decline: OSHA believes that, out of 250 independent battery breaking companies in existence in 1978, only two or three remained when the rulemaking under review was completed, and Meridian Research, an OSHA contractor, identified only two which remained in business at the time of its supplemental study in 1988. See id. at 29,171; Ex. 576 at 2; Ex. 686F at 1-2. These companies are Ashland Metals Company ("Ashland") and Ace Battery ("Ace"). The precipitous decline in membership might overstate the extent of the industry's troubles--at least some of the companies have acquired related businesses or were acquired by companies in other industries, creating integrated lead recovery operations which are no longer considered a part of the independent battery breaking industry.[14] Still, OSHA does not contest that the industry is in a severe downturn--OSHA simply attributes the decline to factors other than the costs of compliance with the previous standard of 200 ug/m[3].
 
 
 85
 Petitioner, the Institute of Scrap Recycling Industries, Inc. ("ISRI") (successor to the National Association of Recycling Industries, Inc.), does not challenge the technological feasibility of the 50 ug/m[3] standard for the battery breaking industry, raising instead only arguments that attack OSHA's conclusion that the standard is economically feasible.[15]
 
 A. Economic Feasibility
 1. OSHA's Findings
 
 86
 OSHA found that the independent battery breaking industry cannot pass any increase in its operating costs either forward or backward, and the industry naturally does not challenge this finding. The industry cannot increase the price to its consumers because it is competing with other sources of lead, primarily raw ore producers, as well as other sources of recovered secondary lead such as the metal scrap industries. On the supply side, more than 50% of used batteries are not recovered for recycling at current prices, indicating to OSHA that decreasing the price paid for the used batteries is also infeasible. These uncontested determinations mean that all of the increased costs of compliance will have to come out of the industry's profits.
 
 
 87
 OSHA further determined that the industry is highly volatile and that its continued existence depends on lead prices. As evidence of the industry's unstable nature, OSHA relied on data indicating very large swings in profitability of the companies in the industry. For example, one of the remaining companies (Ace) had a return on equity of - 23.75% in the 1986 fiscal year and a return of + 56.05% in the 1987 fiscal year. See Ex. 694-1 at 14. Because no regulatory changes affecting airborne lead occurred in that period, OSHA reasoned that the wide swings in profit levels were entirely market-driven.[16]
 
 
 88
 OSHA concluded that the industry could easily accommodate the costs of complying with the standard because it found that the only two companies active in the industry, Ace and Ashland, did not substantially exceed the 50 ug/m[3] limit. In 1986, the year for which the most recent data was available, the arithmetic average exposure at Ashland was 51 ug/m[3], and the highest sampling result was 63 ug/m[3]. See 54 Fed.Reg. at 29,163. Ace had an arithmetic average of 62 ug/m[3]. See id. at 29,164.[17]
 
 
 89
 Ace already limits airborne lead by wetting the entire breaking area in order to reduce lead's mobility, see Ex. 694-1 at 6-7, and Ashland uses wetting along with automation of its operations and enclosure of the breaking area. See 54 Fed.Reg. at 29,165. OSHA found that additional controls could reduce the exposure levels to 50 ug/m[3] and that such additional controls would require minimal costs and no technological advances because both companies are already close to the PEL of 50 ug/m[3]. OSHA determined that in the best case scenario the PEL might be attained by Ace through ventilation of its industrial battery cutting operation and by Ashland through the installation of an additional water spray system. See id. at 29,171. In the worst case scenario, which OSHA considers "unlikely," both companies would be required to enclose, automate and ventilate certain operations and to engage in additional cleaning of their facilities to lower the incidence of airborne lead. See id. Total annual costs for the Ace factory were estimated at between $4,319 and $29,885, depending on whether the best case or the worst case scenario proved accurate. This would cause a reduction in Ace's profits of between 2.3% and 16.1%. See id. at 29,171-72. Total annual costs for Ashland would range between $3,453 and $41,619, which would reduce Ashland's profits by between 1.9% and 22.4%. See id. Based on these estimates, OSHA found that no undue burden would be placed on the industry's profitability by a PEL of 50 ug/m[3] and that a new factory planning to join the industry indicates the potential for the overall profitability of this industry. See id. at 29,172. OSHA therefore concluded that the standard was economically feasible for the industry.
 
 2. Industry Challenges
 
 90
 ISRI claims that the post-1978 disappearance of almost the entire industry is conclusive evidence of the industry's distress and that imposition of further costs through the implementation of a 50 ug/m[3] PEL is certain to spell doom for the remaining two members of the industry. The industry's argument rests on the premise that the previous 200 ug/m[3] standard caused the industry's severe decline because almost no company in existence could comply and still remain profitable. ISRI argues that a 50 ug/m[3] standard would ipso facto destroy the rest of the industry, thereby violating the economic feasibility requirement of Steelworkers. ISRI does not, however, challenge any of OSHA's specific findings relating to the impact of the standard on the two factories remaining in the industry. Instead it engages in a flanking attack whereby it attempts to discredit OSHA's specific findings by stressing the overall distress in the industry which, it believes, demonstrates that any further squeeze on profits will prove fatal.
 
 
 91
 As we noted, OSHA does not dispute the factual premise of the industry's challenge--that there has indeed been a drastic decline in the number of companies constituting the industry--but proffers another explanation for that decline. According to OSHA, the true causes of the industry's distress are (1) the requirements imposed by the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Secs. 6901 et seq., and (2) a steady decline in the price of raw lead, which made many of the recycling operations uneconomical regardless of the airborne lead standard imposed.
 
 
 92
 RCRA's standards required the classification of battery casings as hazardous wastes and, because battery breakers disposed of their empty battery casings by simply storing them on their property, such operators became subject to extensive legal requirements such as monitoring, demonstrating their financial responsibility, and taking necessary corrective measures to avoid pollution of ground waters. Still others faced large additional expenses in complying with RCRA regulations through additional recycling or moving the casings to a landfill approved by the Environmental Protection Agency for permanent disposal. For all of them, the costs of operating under the RCRA regime proved too high, and they left the industry. See Ex. 576 at 2-3.
 
 
 93
 The other severe blow suffered by the industry was the decrease in worldwide prices for lead. Especially debilitating was the diminishing differential between the price of pig lead (lead produced from lead ores) and scrap lead (the product of battery breaking and other types of used lead recycling). The price of pig lead in constant dollars decreased from 50.07 cents/lbs in 1980 to 17.65 cents/lbs in 1985. The scrap lead prices in the same period fell from 27.13 cents/lbs to 6.38 cents/lbs, apparently to preserve competitiveness with pig lead prices. See id. at 4. It seems obvious that a fourfold reduction in the price commanded by the industry's product is bound to have drastic consequences for the financial health of the industry.
 
 
 94
 OSHA supports its contention that these factors were responsible for the industry's fate by pointing out that the previous 200 ug/m[3] PEL (which ISRI blames for the industry's decline) went into effect in 1971, see Steelworkers, 647 F.2d at 1204, but that the industry as a whole was still robust up to 1978, when the other factors began to take their toll. OSHA concludes that the threat of extinction facing the industry is independent of any possible lead standard that it might promulgate and that the industry's fate is primarily dependent at this time on lead prices on the world market. In other words, OSHA believes that in light of the minimal costs of complying with the standard, any negative influence on the industry's fate caused by compliance with this rule will be swamped by the larger effects of lead prices and environmental requirements. In the event of an upturn in the demand for the industry's product, the additional costs of compliance will be easy to bear, while in the event of a further decline in lead prices or an additional tightening of RCRA's requirements, the companies are likely to disappear regardless of the standard adopted by OSHA.
 
 B. Conclusion
 
 95
 We defer to OSHA's reasonable determination of economic feasibility. ISRI does not challenge OSHA's finding that the only two companies in this industry (as of the date of the rulemaking) would be able to meet the additional expense of complying with the 50 ug/m[3] PEL. The claim that the industry is in distress might well be true, but because the PEL is unlikely to be determinative of the industry's fate, the proposed standard does not threaten economic infeasibility. We can conceive of a situation where the extra costs of compliance, even if small in absolute terms or by comparison with other factors, causes the tip-over of the industry into a state of economic infeasibility, but ISRI does not present any evidence that the extra expense of compliance with OSHA's requirements in this case would be the proverbial final straw.
 
 V. SECONDARY COPPER SMELTING
 
 96
 The secondary copper smelting industry is a recycling industry that recovers copper from copper-containing scrap by preparation, smelting, refining and casting operations. See 54 Fed.Reg. at 29,246. The operations of secondary copper smelters involve an iterative process whereby the scrap is repeatedly melted and refined so that lead and other impurities are eliminated until acceptably pure copper is produced and then cast into a desired shape. See id. Because preparation of scrap for smelting involves cutting and handling the lead-containing scrap, some airborne emissions occur at that time, but the bulk of airborne lead particles is produced by the repeated melting of the scrap. Since every melting produces heated particles with sufficient velocity to escape into the air, it is not surprising that many areas of smelting plants have high levels of airborne lead.
 
 
 97
 The consumption of copper reveals no long-term secular trend either up or down in the years covered by OSHA's study (1966-1986). See Ex. 573 at 7. The trade balance has changed from the exportation of small amounts to the importation of 15%-20% of the total consumption in later years. See id. at 8. The profitability of the industry has been significantly reduced by a number of technological and economic factors. Prices for copper have declined in real terms because of the availability of substitutes for copper. The largest traditional consumer of copper, wire-making, has increasingly relied on aluminum and, more recently, glass (in fiber optics) for its needs, while the other major user, the residential housing market, has increasingly moved toward plastics as substitutes for copper in home-building. In addition, prices for raw copper, which is a perfect substitute for recycled copper, have declined, limiting the industry's ability to recover additional expenditures through price increases. OSHA determined that in light of the competitive nature of world copper markets, no pass-through of additional costs to the consumers of copper was possible. See 54 Fed.Reg. at 29,259.
 
 
 98
 Concurrently, the ability of the industry to pass its costs back to its suppliers has been limited by the increase in the amount of metal scrap exported from the United States to foreign countries, which means that any attempts by secondary copper smelters to reduce the prices paid to scrap dealers are likely to be unsuccessful and lead only to increased exports of scrap. In light of these factors, the industry's profitability has moved downward and, accordingly, the industry has decreased in size. Out of the twenty secondary copper smelters in existence in 1965, only five remain operational. See Ex. 582-89 at 16.
 
 A. Technological and Economic Feasibility
 1. OSHA's Findings
 
 99
 OSHA found that the 50 ug/m[3] PEL standard can be attained through currently available technology. In so finding, it relied heavily on data from Company D, which it found to be the most useful data available. See 54 Fed.Reg. at 29,247. Company D provided the results of its air quality monitoring during 1984-87, and OSHA made a site visit to the plant that allowed it to understand and interpret the company's data. See id. at 29,247-48. OSHA found that 63% of the measurements were in excess of 50 ug/m[3], with the highest measurements being recorded in the blast furnace area, where 79% of all measurements were above the new PEL and the majority of the measurements exceeded 100 ug/m[3]. See id. at 29,248, Table 1. OSHA discovered, however, that some of the high measurements were in areas of the plant where high levels were not likely to appear if quite simple and inexpensive precautions are taken.
 
 
 100
 OSHA concluded that the most important reason for excessive amounts of airborne lead (as compared with levels expected given the low proportion of lead remaining in the molten metal) was cross-contamination from high lead areas of the plant, primarily the blast furnace and the scrapyard. It therefore concluded that the most important step toward bringing the industry into compliance with the 50 ug/m[3] PEL would be the development of an industrial hygiene system focusing on the installation of barriers to prevent cross-drafts from carrying the airborne lead through the facility. See id. at 29,251. Company D had never tried to implement such a program. See id. OSHA believes that the proposed elimination of cross-contamination would bring the geometric mean exposure levels down to approximately 50 ug/m[3] in all areas of the plant except the blast furnace area, where the lead concentrations in the molten metal itself are very high and where OSHA decided to allow use of respirators for supplemental protection. See id. at 29,250. OSHA concluded that the companies can reduce the geometric mean exposure in seven out of fourteen operations in the blast furnace area to or below 50 ug/m[3]. See id. at 29,253.
 
 
 101
 OSHA determined that compliance costs would consist of expenditures for additional ventilation, enclosure of various equipment, and improved housekeeping, and estimated that the annual costs of compliance with these measures would be $278,588 for Company D. See id. at 29,258-59. Of the four remaining industry members, three more would require the same level of expenditure and the fifth, which has the largest plant, would require about three times the expenditures of each of the other four plants. See id. at 29,259. OSHA therefore estimated that total compliance costs for the industry would amount to approximately $1.9 million, which represents almost 40% of the estimated industry profits of $5 million. See id. Taking into account the tax deductibility of the expenditures, the compliance costs would reduce industry profits by 25%. OSHA concluded that with a compliance period of five years the expenditures would not threaten the industry's structure or existence. See id. at 29,259-60.
 
 2. Industry Challenges
 
 102
 ISRI does not believe that the standard is feasible either technologically or economically.
 
 
 103
 (a) Best Available Evidence. ISRI's first challenge is that the best evidence available to OSHA indicated that the findings of OSHA's consultant, Meridian Research, were incorrect. That "best evidence" consisted of the industry's compliance experience with the existing 200 ug/m[3], which, according to ISRI, proved that any further lowering of the standard was impossible. ISRI also cites the experience of the lead smelting industry, which, it claims, has closely related processes and which has been granted broad exemptions from the 50 ug/m[3] PEL.
 
 
 104
 (i) Evidence From a Large Copper Smelter. As noted above, the industry underwent considerable contraction in the last quarter century, shrinking from twenty producers to five. ISRI points to the experience of the largest copper smelter then in existence, United States Metals Refining Company ("USMRC"), as indicative of the infeasibility of the standard. It claims that USMRC went out of business as a result of its attempt to comply with the 200 ug/m[3] PEL and that its officers indicated that it had already expended $12 million for compliance measures and had committed another $13 million for further efforts, but had no expectation that these expenditures would bring it into compliance. It is claimed that USMRC decided that closing its copper smelter was the only plausible course of action. The evidence about the causes of USMRC's closing is, however, far more ambiguous than the industry would have us believe. USMRC's officers testified that they could not comply with a 50 ug/m[3] standard "within the allotted period of time," see Ex. 475-31A at 9, but that they hoped to attain that goal within seven years. See Ex. 475-31B at 19. The industry's claim that USMRC's demise was caused by its inability to comply with the airborne lead standard is also unpersuasive. OSHA had evidence that USMRC was "struggling against depressed industry conditions, facing increased competition from imports and substitutes, and plagued by its continuing inability, after expending millions upon millions of dollars, to reduce its plant's air lead levels below 200 ug/m[3] with engineering and work practice controls alone." Ex. 582-89 at 32. OSHA could reasonably find that USMRC's closing was caused not by the inability to comply but by other factors and that, in any case, USMRC was able to comply, albeit after a longer period than OSHA was willing to allow.[18]
 
 
 105
 (ii) Evidence From Lead Smelters. ISRI's second argument that the best available evidence indicates the standard's infeasibility is the existence of so-called Cooperative Assessment Plans ("CAPs") in the lead smelting industry. According to ISRI, CAPs came into existence because lead smelters found themselves unable to comply with the 50 ug/m[3] PEL. OSHA allegedly recognized the impossibility of compliance by entering into agreements with individual producers that indicated the actual feasibility level for a given facility. ISRI argues that the widespread use of CAPs for lead smelters is indicative of that industry's inability to comply with the 50 ug/m[3] and that technological similarities between the processes used in lead smelting and copper smelting should lead OSHA to the same conclusion in the copper industry's case.
 
 
 106
 OSHA responds that no lessons for copper smelters can be drawn from the lead smelting experience because of the differences in the lead content of the processes. In lead smelting, the principal product being refined is lead itself, which means that the molten metal that is the main source of airborne lead has a very high lead content. In copper smelting, by contrast, the lead residue represents a small (and diminishing with every step) percentage of the molten metal and, therefore, its levels of emissions are much lower. Although ISRI responds that copper smelting processes occur at higher temperatures, thereby increasing the number of molecules that escape into the air, it seems that the agency could permissibly determine that the differences outweigh the similarities between the two processes and that the experience of the lead smelters has no bearing on the feasibility for the copper smelting industry. In light of the demonstrated sharp decrease in the lead emissions as the concentrations of lead in copper drop through the repeated refinements, this conclusion is certainly supported by substantial evidence on the record.
 
 
 107
 (b) Contractor Issues. ISRI makes much of the fact that OSHA's first contractor, JACA Corporation, allegedly found that 50 ug/m[3] was not feasible for secondary copper smelters, although we note that the JACA study is far more ambiguous on the score of economic feasibility than ISRI allows. See Ex. 553(5) at 1-4, 1-5, 3-7, 3-8. JACA's study, in any case, was conducted in 1982, and OSHA is not bound by the state of knowledge about the industry extant almost a decade ago. Since OSHA could reasonably rely on the ability of its later contractor, Meridian Research, to produce accurate studies, it had the right to ignore the arguably inconsistent but certainly out-of-date JACA study, if that decision was explained. It was. See 54 Fed.Reg. at 29,247.
 
 
 108
 The second challenge to the employment of the outside contractors focuses on Meridian's alleged inability to produce reliable analysis.[19] ISRI claims that Meridian conducted no in-depth investigation, relied on data it had not gathered, and could not possibly have conducted the project competently in the three-month period given by OSHA. ISRI does not offer any specific instances, however, where the haste of Meridian led to incorrect results. All petitioners had the opportunity to comment on Meridian's preliminary report and many did so. See id. at 29,143. Representatives of this industry questioned OSHA's expert witnesses and witnesses from Meridian at a hearing before an Administrative Law Judge of the United States Department of Labor. See id. In light of ISRI's opportunity to bring forth Meridian's errant ways, a barebones allegation of incompetence without showing any specific error cannot prevail. We also reject ISRI's claim that Meridian was required to conduct on-site visits of the plants in the industry. Without some showing that these visits would provide substantially different data than that assembled by Meridian, this particular "failing" of the contractor cannot appreciably undermine the validity of the agency's decision.
 
 
 109
 (c) OSHA's Failure to Bifurcate Industry. ISRI also claims that OSHA behaved arbitrarily and capriciously in allowing a higher 75 ug/m[3] PEL for non-ferrous foundries with twenty or fewer employees, but disallowing a similar small company exception for the copper smelters. OSHA explained that the structure of the foundry industry made such an approach desirable because a 50 ug/m[3] PEL was economically infeasible for the industry as a whole due to the severe effects it would have on small foundries. OSHA made no such finding for the copper smelting industry because there are only five producers in the copper smelting industry, all employing over 150 workers. See Ex. 573 at 21. OSHA therefore determined that the secondary copper smelting industry has no "small business" segment comparable to the foundry industry, and we cannot say that its decision was unreasonable.
 
 B. Conclusion
 
 110
 We find sufficient support in the record for OSHA's findings of technological and economic feasibility.
 
 VI. NON-FERROUS FOUNDRIES
 
 111
 Non-ferrous foundries manufacture castings composed of non-ferrous metals, including lead-bearing copper-based castings made from ingots produced by the brass and bronze ingot industry. See 54 Fed.Reg. at 29,239. In the initial rulemaking proceedings reviewed in Steelworkers, non-ferrous foundries and brass and bronze ingot manufacturing were treated as one industry. The Steelworkers court stated that "[t]he prospects for technological feasibility in this industry appear at first to be very good" given the five-year implementation period allowed by OSHA and given an OSHA consultant's "conclusory statement that the proposed standard is feasible for this industry." The court nonetheless concluded "with very great reluctance" that OSHA had failed to meet its burden of demonstrating technological feasibility. Steelworkers, 647 F.2d at 1293. As with many of the other remand industries, the major deficiencies were that OSHA had failed "to cite some record evidence promising technological developments that might meet the PEL in the long range" and had not "attempted with some specificity ... to explain how it inferred the feasibility of the final standard from a record that chiefly addressed the proposed standard [of 100 ug/m[3]]." Id. Because the question of technological feasibility remained unresolved, the standard's economic feasibility was also left open on remand. See id. at 1294.
 
 
 112
 During the remand proceedings, OSHA received permission from this court to analyze the foundries and the ingot manufacturers as separate industries. In its final rule published in July 1989, OSHA determined that a PEL of 50 ug/m[3] was technologically feasible for the non-ferrous foundry industry, but that it was not economically feasible because it would have a crippling effect on the small foundry segment of the industry. See 54 Fed.Reg. at 29,245-46. OSHA then received permission from this court to conduct further proceedings to determine whether a PEL between 50 and 200 ug/m[3] would be feasible for the industry. See 55 Fed.Reg. at 3147. In January 1990, OSHA imposed a bifurcated standard on the industry based on its conclusion that a PEL of 50 ug/m[3] was economically feasible for large foundries (those with twenty or more employees) and that a PEL of 75 ug/m[3] was feasible for small foundries (those with fewer than twenty employees). See id. at 3146, 3166-67. Before this court, the American Cast Metals Association ("ACMA") (formerly the Cast Metals Federation) challenges OSHA's findings of technological and economic feasibility on a variety of grounds.
 
 A. Technological Feasibility
 
 113
 The main operations in non-ferrous foundries are mold-making and coremaking, furnace operations, pouring of molten metal, removal of castings from molds, and cleaning and finishing of castings. See 54 Fed.Reg. at 29,221. The primary sources of lead exposure in non-ferrous foundries are fumes emitted by the furnace and ladle, dust generated by the cutoff saw, and fumes and dust released when the molds are opened. Grinding in the finishing area and recycling of lead-contaminated sand also produce airborne lead. See id. at 29,223. OSHA found in its July 1989 rulemaking that a PEL of 50 ug/m[3] was technologically feasible for the non-ferrous foundry industry as a whole.
 
 1. OSHA's Findings
 
 114
 OSHA based its technological feasibility findings primarily on its analysis of a number of data sets of exposure levels at non-ferrous foundries. OSHA relied most heavily on data submitted by two foundries (coded Foundry E and Foundry F), which it determined provided the best evidence "because their exposure data are supplemented by extensive information on plant conditions, processes, and controls largely gathered on recent OSHA site visits." 54 Fed.Reg. at 29,224. OSHA also found that, although both foundries had implemented controls that exceeded the industry norm, the data from the foundries were indicative of what the industry as a whole could achieve because the controls were "conventional in character and readily available in the marketplace." Id. at 29,227.
 
 
 115
 From the raw data submitted by Foundries E and F, OSHA calculated the geometric mean exposure level for each job category. See id., Table A. The results of these calculations, buttressed by expert testimony, persuaded OSHA that airborne lead produced in some parts of the foundries contributed to exposures in other areas that did not themselves contain lead-emitting operations. See id. at 29,226. OSHA then adjusted the data sets to exclude the effects of this cross-contamination. See id. at 29,227, Table A.
 
 
 116
 The raw exposure data showed that six of eleven operations were already below 50 Sg61m[3] at Foundry E and that eleven of fifteen operations were below 50 ug/m[3] at Foundry F. After adjusting for cross-contamination, only three job categories at Foundry E and two at Foundry F remained above 50 ug/m[3]. At both foundries, the only jobs that exceeded 50 ug/m[3] by a significant amount were the pourer and the cutoff/gate saw operator. See id.
 
 
 117
 Based on site visits to Foundries E and F, OSHA determined that both could reduce exposure levels to even lower levels by a variety of conventional means, including: conducting a comprehensive industrial hygiene survey to identify particular practices (beyond those identified by OSHA) that contribute to lead exposures and to cross-contamination; eliminating cross-contamination; improving ventilation at certain key operations; implementing technology used in one foundry but not the other; increasing the supply of "makeup air" to correct imbalances in air pressure as air is exhausted; installing fresh air islands and otherwise separating workers from air containing high lead concentrations; better housekeeping practices (one of the foundries had not conducted a plant-wide cleaning in eighteen months); and improved employee work practices. See 54 Fed.Reg. at 29,229-33.
 
 
 118
 OSHA calculated that by eliminating cross-contamination, improving existing controls, and installing additional controls, both foundries could reduce exposure levels to or below 50 ug/m[3] in virtually all operations. OSHA's data showed, in fact, that geometric mean exposure levels could be reduced to below 30 ug/m[3] in nineteen of twenty-six operations. It therefore concluded that a PEL of 50 ug/m[3] was technologically feasible for the non-ferrous foundry as a whole. See id. at 29,235-36.
 
 2. Industry Challenges
 
 119
 ACMA challenges OSHA's finding of technological feasibility, arguing that OSHA failed to use the best available evidence; that OSHA should not have analyzed exposure data using the geometric mean and that it was inconsistent in using the geometric mean; and that OSHA should not have relied upon the work of its contractor, Meridian Research. For the reasons explained below, we reject each of these arguments.
 
 
 120
 ACMA argues that OSHA failed to use the best available evidence because it ignored or rejected compelling evidence contained in various industry submissions indicating that a 50 ug/m[3] PEL is not feasible. This evidence, ACMA claims, demonstrated that no existing foundry, including Foundries E and F, has been able to achieve a PEL of 50 ug/m[3] consistently. ACMA especially emphasizes the purported inability of Foundries E and F to achieve this level because these foundries employ state-of-the-art technology.
 
 
 121
 OSHA responds that, although it did review and consider the data submitted by the industry, it rejected as unpersuasive the industry's assertions that existing foundries were unable to achieve compliance despite their most concerted efforts to do so. OSHA considered the best available evidence to be that obtained from its extensive analysis of exposure levels at Foundries E and F, which showed that these foundries were already successfully controlling most of their operations to or below 50 ug/m[3] and that further improvements could be made by use of existing technology and improved practices. Although the industry submissions cited by ACMA assert that these foundries have been unable to control their operations to this level, see, e.g., Ex. 684F at 12-13; Ex. 694-25 at 2-7, we believe that OSHA more than adequately responded to these assertions and demonstrated that, to the extent operations are not currently controlled to 50 ug/m[3], additional feasible controls will reduce exposures to or below that level in virtually all operations. See 54 Fed.Reg. at 29,236-37.
 
 
 122
 Furthermore, many of the industry submissions seemed to assume that a PEL was feasible only if all exposures in the workplace were below the specified level all of the time. See, e.g., Ex. 694-25 at 7; Ex. 694-26 at 11-12; Ex. 694-28 at 2. In fact, OSHA's finding that a certain PEL is feasible does not mean that an employer violates the standard whenever an employee is exposed to more than that amount. Under Steelworkers, OSHA must prove only "a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the PEL in most of its operations." Steelworkers, 647 F.2d at 1271. As noted earlier, OSHA's enforcement policy takes into account that readings in excess of the PEL may be due to uncontrollable random variations, and it generally will issue a citation only if it determines that conditions at the time of inspection were representative. See 54 Fed.Reg. at 29,149. Moreover, an employer can avoid a citation for excessive exposure levels if it can show that controls to achieve the PEL are infeasible in its workplace and that the employer has achieved the lowest feasible level above the PEL, and the lead standard requires that engineering and work practice controls be used to achieve the PEL only when an employee is exposed to levels over 50 ug/m[3] for more than thirty days per year. See 29 C.F.R. Sec. 1910.1025(e)(1).
 
 
 123
 The decisive question in determining whether OSHA relied upon the best available evidence in making its technological feasibility determination is whether Foundries E and F are sufficiently representative of what the industry as a whole can achieve. ACMA stresses that both foundries are considered within the industry to be state-of-the-art, that Foundry F assertedly was built for the express purpose of trying to meet a PEL of 50 ug/m[3], and that the company that owns Foundry F claims it has been unable to retrofit an existing foundry to achieve compliance. OSHA replies that Foundries E and F provide the best evidence precisely because they are equipped with the most advanced equipment and procedures currently used within the industry. Because the controls used by these foundries and the further controls recommended by OSHA are "conventional in character and readily available in the marketplace," 54 Fed.Reg. at 29,227, OSHA concluded that the typical firm in the industry could implement them. This finding is consistent with the requirements of Steelworkers, where we stressed that because the OSH Act is a technology-forcing statute, "OSHA can impose a standard which only the most technologically advanced plants in an industry have been able to achieve--even if only in some of their operations some of the time." Steelworkers, 647 F.2d at 1264. The Act even permits OSHA to impose a standard that would require employers to rebuild their factories, so long as doing so is economically feasible. See id. at 1295. We therefore find no fault with OSHA's conclusion that the data from Foundries E and F provided the best evidence available to it.
 
 
 124
 Like other industries in this proceeding, ACMA also challenges OSHA's use of the geometric mean in calculating existing exposure levels. As explained above in our discussion of the lead chemicals industry, however, use of the geometric mean was a generally acceptable method of characterizing the exposure data in OSHA's possession. Furthermore, even granting the industry's argument that foundries will have to target a level well below 50 ug/m[3] in order to be assured of compliance, OSHA concluded that, after adoption of its recommended controls, "geometric mean exposure levels in over 95% of the combined job categories are anticipated to be well below 50 ug/m[3]. In fact, over 73% are anticipated to be below 30 ug/m[3]...." 54 Fed.Reg. at 29,238.
 
 
 125
 ACMA also argues that OSHA acted inconsistently when, in its January 1990 supplemental rulemaking, it decided not to use the geometric mean to characterize exposure data for small foundries. OSHA provided a cogent reason for not using the geometric mean in this instance, however, explaining that there was unusually wide variability in the exposure data for these foundries and that it found this variability (which would be suppressed by use of the geometric mean) crucial in assessing the feasibility of compliance with various proposed control levels. See 55 Fed.Reg. at 3154 n. 2. (As discussed further below, OSHA found that exposure readings mainly fell either below 100 or 75 u g/m[3], or above 200 ug/m[3]. This indicated to OSHA that some small foundries were essentially uncontrolled, while others were already controlled to or near the 75 ug/m[3] level.)
 
 
 126
 Finally, ACMA joins several other industries in challenging the competency of OSHA's contractor, Meridian Research, which gathered much of the data and conducted much of the analysis relied upon by OSHA. Specifically, ACMA faults OSHA's reliance on the panel of three industrial hygienists employed by Meridian, arguing that their lack of engineering experience renders their conclusions suspect. OSHA argues in response that the panel was well-qualified to make the assessments it did because the principles of industrial hygiene are directly applicable to determinations of how best to control exposure to toxic substances. Individually, the panel members were experienced in identifying and measuring exposures to toxic substances and were familiar with the techniques available for reducing such exposures. See Ex. 695 (resumes of panel members). Particularly in light of OSHA's statement that its findings were its own and were based on an independent review of the entire record (including industry comments on Meridian's reports), see 54 Fed.Reg. at 29,238, this explanation suffices to justify OSHA's use of Meridian.
 
 B. Economic Feasibility
 
 127
 ACMA's next set of challenges attacks OSHA's conclusion that a
 
 
 128
 PEL of 50 ug/m[3] is economically feasible for large non-ferrous foundries and that a PEL of 75 ug/m[3] is economically feasible for small foundries. We reject these challenges as well.
 
 1. OSHA's Findings
 
 129
 In its July 1989 rulemaking, OSHA separately evaluated compliance costs and their effects for small foundries (fewer than twenty employees) and large foundries (twenty or more employees). OSHA concluded that large foundries could finance the costs of the rule without undue burden because the industry was generally profitable and, to the extent that cost pass-through was not possible, large foundries generally could finance the costs out of profits. For small foundries, however, OSHA's data indicated that the rule would have crippling results. Cost pass-through generally was not possible, and for many of these foundries the costs of compliance would exceed profits. Some small foundries could shift production away from leaded alloys, and some might avoid compliance costs by qualifying for the lead standard's exemption for employers whose workers are exposed to excessive levels of lead for thirty or fewer days a year. Still, OSHA determined that between 42% and 57% of small foundries would be forced to cease business. Although some of these firms would exit the industry regardless of the rulemaking, OSHA concluded that the impact of a 50 u g/m[3] PEL on small foundries, which constitute 60% of the foundries in the industry, rendered the standard economically infeasible for the industry as a whole. See 54 Fed.Reg. at 29,245-46.
 
 
 130
 Following further consideration ordered by this court, OSHA reaffirmed its finding that a PEL of 50 ug/m[3] was economically feasible for large foundries and concluded that a PEL of 75 ug/m[3] was economically feasible for small foundries. The latter finding was based primarily on an analysis of data compiled by OSHA during compliance inspections of small foundries. See 55 Fed.Reg. at 3148. This analysis showed
 
 
 131
 a preponderance of exposures under
 
 
 132
 100 ug/m[3] (with most of those also below 75 ug/m[3]), a number of others over 200 ug/m[3], and relatively few in between. This distribution of exposures indicated to OSHA that a number of small foundries were effectively limiting exposures, while others were substantially uncontrolled. See id. at 3150-54. Based on this, OSHA concluded that substantial compliance costs would be incurred only by small foundries that were not already well controlled to the 200 ug/m[3] level and that the cost of complying with a PEL of 75 ug/m[3] would not be substantially greater than for levels of 100 or 150 ug/m[3]. See id. at 3160.
 
 
 133
 OSHA then estimated that only 259 of the 736 foundries classified as small would incur any costs for controls. See id. at 3160-62. Of those 259 foundries, approximately 138 would suffer profit erosion under a 75 ug/m[3] PEL serious enough to force them out of business. See id. at 3164, Table 31. OSHA concluded that the closure of this number of foundries (or a somewhat higher number, under an alternative analysis using more stringent assumptions) would not threaten the competitive structure of the industry as a whole or lead to undue concentration within the industry given that these foundries account for only 4% (6%-7% under the alternate assumptions) of the industry's capacity. See id. at 3165-66.
 
 2. Industry Challenges
 
 134
 Although ACMA repeatedly emphasizes the number of small foundries that may be forced out of business by OSHA's rulemaking, it does not directly challenge OSHA's conclusions that, assuming the estimates are correct, the competitive structure of the industry will not be undermined and undue concentration will not result. Given the rather modest impact these closings would have on the industry as a whole, these conclusions seem clearly correct. See, e.g., Steelworkers, 647 F.2d at 1292-93 (upholding feasibility finding for battery industry despite evidence that as many as 200 small producers might go out of business; continued competition would be assured among the at least thirty larger firms, controlling 90% of the market, that would remain). ACMA instead challenges three specific features of OSHA's cost estimates that it believes caused OSHA to underestimate the true costs of compliance and therefore to understate the effects of the rule on the industry as a whole. We consider each of these challenges in turn below.
 
 
 135
 ACMA's first complaint concerns OSHA's estimates of the costs to foundries of installing improved ventilation systems. As OSHA recognizes, improved ventilation is the primary and most costly of the controls recommended by OSHA. Accordingly, OSHA's compliance cost estimates were dominated by ventilation costs. In its initial evaluation of non-ferrous foundries, Meridian Research estimated that compliance costs due to ventilation improvements would average $15/cfm ("cubic feet per minute" of air moved) throughout the industry. Meridian later revised this finding downward for small foundries, concluding that their ventilation compliance costs would average only $7/cfm. In its July 1989 rulemaking, OSHA adopted the $15/cfm figure for large foundries and the $7/cfm figure for most small foundries (for very small foundries, those with fewer than 10 employees, OSHA estimated a cost of only $4/cfm). See 54 Fed.Reg. at 29,240-41 (reviewing Meridian's findings and OSHA's conclusions). ACMA challenges OSHA's adoption of figures below $15/cfm for small and very small foundries.
 
 
 136
 OSHA's findings for small and very small foundries were based on evidence that ventilation compliance costs would be substantially lower for such foundries due to their lesser need for ductwork (the most costly component of an exhaust system) compared with larger foundries. This evidence included the testimony of a toxicologist and industrial hygienist, who provided an estimate of between $4 and $7/cfm for small foundries, and a price quote of $6.91/cfm made by a major vendor to one small foundry (the Prattville Castings Facility) for the purchase and installation of an adequate ventilation system. See 54 Fed.Reg. at 29,240; Ex. 643 at 8-9; Ex. 686A at 43-44. ACMA's challenge to the figures adopted by OSHA relies primarily on a statement in a submission by the Guimond engineering firm that, based on the author's "personal experience [as] a foundry engineer," the figures are "not supportable because many small non-ferrous foundries cannot undertake substantial ductwork and installation of mobile ventilation systems without significant modifications in foundry structure and layout"--factors "nowhere considered" in Meridian's final report. Ex. 694-27 at 4. The Guimond submission also asserted that the $6.91/cfm quote was made to a foundry with a "miniscule" leaded alloy production rate. See id. at 4 n. 3.
 
 
 137
 OSHA emphasizes in response that the $15/cfm figure represented an average for the entire industry and that the reduction in the figure for small foundries was primarily based on the evidence presented that ductwork would be less expensive for small foundries. The industry-wide average included estimates of "all aspects of installing and maintaining" necessary ventilation systems, including structural modifications. See Ex. 686A at 43. (The author of the Guimond report himself acknowledged elsewhere that the $15/cfm industry-wide figure was a reasonable one based on all relevant considerations, including structural modifications. See Ex. 682 at 8-9.) In the absence of any evidence from the foundry industry that structural alterations will be more expensive for small foundries, we cannot fault OSHA for using this generally reasonable methodology for calculating ventilation compliance costs for small foundries.
 
 
 138
 The record also appears to rebut ACMA's assertion that the Prattville facility is unrepresentative because it uses "miniscule" amounts of leaded alloys. According to ACMA, Prattville is the facility referred to by OSHA as Foundry C. OSHA's compliance inspection data indicate that in 1985 (the year the vendor quote of $6.91/cfm was made) substantial enough quantities of leaded alloys were in use at Foundry C that exposure readings often exceeded 200 ug/m[3]. See 55 Fed.Reg. at 3151. The lower readings relied upon by ACMA came only in later years. See id.
 
 
 139
 ACMA's next challenge to OSHA's cost estimates is that brass and bronze ingots, the foundry industry's raw material, may increase in price as a result of this rulemaking and that OSHA failed to take that increased cost into account in its feasibility analysis for non-ferrous foundries. In its feasibility analysis for the brass and bronze ingot industry, however, OSHA found that the ability of ingot producers to raise prices is limited and that they therefore will likely have to pay the costs of compliance out of profits. See 54 Fed.Reg. at 29,161. (As discussed in the next section, the brass and bronze ingot manufacturers challenge OSHA's economic feasibility determination on several grounds, but they agree with its conclusion that the industry probably cannot pass the costs of compliance on to customers.)
 
 
 140
 ACMA also faults OSHA for failing to include automation expenses in its cost estimates. Because OSHA's finding of technological feasibility depended heavily on its analysis of Foundries E and F, the latter of which has automated two of its operations (shakeout and sandhandling), ACMA concludes that OSHA's exclusion of automation expenses from its cost calculations renders its conclusions fatally incomplete.
 
 
 141
 OSHA's approach to industry compliance with the lead standard, however, does not require that employers use any particular controls or combination of controls to achieve compliance. See 54 Fed.Reg. at 29,144. OSHA's cost estimates for the non-ferrous foundry industry were based on the controls that it believed a typical employer would need to implement. Based primarily on its analysis of Foundries E and F, OSHA concluded that a combination of controls such as improved ventilation, elimination of cross-contamination between foundry areas, and better housekeeping were all that were needed to bring the typical foundry into compliance. See id. at 29,240-43. Exposure data from Foundry E, where neither shakeout nor sandhandling operations are automated, support OSHA's conclusion: when adjustment was made for cross-contamination effects, exposure levels for these operations were already near or below 50 u g/m[3]. See id. at 29,235. Additional conventional controls were expected to reduce exposures even further. See id. Moreover, OSHA cogently points out that, because the rule does not require the complete elimination of all exposures, including automation expenses in the compliance cost calculations for these or other operations might greatly overstate the costs employers would have to incur in order to comply with the rule. We conclude that these explanations suffice to justify OSHA's decision not to include automation costs in its estimates of the foundry industry's costs of compliance.
 
 
 142
 ACMA raised one additional challenge to OSHA's economic feasibility findings in its opening brief to this court, arguing that OSHA violated the requirements of notice and comment rulemaking when it failed to give notice, prior to the close of the record in May 1988, that it might adopt different PELs for large and small foundries. ACMA explicitly withdrew this argument in its reply brief, however, and we therefore decline to address it.
 
 C. Other Feasibility Issues
 
 143
 ACMA raises two other sets of challenges that go to OSHA's findings on both technological and economic feasibility. We find that these challenges also lack merit.
 
 
 144
 1. OSHA's "Uncertainty"
 
 
 145
 ACMA argues that OSHA's feasibility determinations should be overturned because OSHA expressed uncertainty concerning the feasibility of a 50 ug/m[3] prior to the July 1989 rulemaking, did so again in the rulemaking itself when it found the PEL economically infeasible, and did so yet again in the January 1990 rulemaking when it stated that it would reexamine the 75 ug/m[3] PEL it imposed on small non-ferrous foundries after three years. See 55 Fed.Reg. at 3146.
 
 
 146
 Under Steelworkers, OSHA is not required to be "certain" of its conclusions. "As for technological feasibility, we know that we cannot require of OSHA anything like certainty.... OSHA's duty is to show that modern technology has at least conceived some industrial strategies or devices which are likely to be capable of meeting the PEL and which the industries are generally capable of adopting." Steelworkers, 647 F.2d at 1266. Economic feasibility determinations, which of course are heavily dependent on technological feasibility findings, must be based on "a reasonable assessment of the likely range of costs of [the] standard, and the likely effects of those costs on the industry." Courts, however, "cannot expect hard and precise estimates of costs." Id.
 
 
 147
 The regulatory statements ACMA points to do not indicate that OSHA has failed to meet these standards. Its finding of economic infeasibility in the July 1989 rulemaking was clearly premised on the infeasibility of a 50 ug/m[3] PEL for small foundries, not on any fatal uncertainty in its analysis of the information available to it. In its supplemental rulemaking addressed to this issue, OSHA collected and analyzed an extensive range of information and concluded that a 75 ug/m[3] PEL was economically feasible for small foundries. OSHA's willingness to reexamine this finding after three years (two years before the end of the five-year implementation period) does not undermine its present feasibility findings, but rather reflects a prudent decision to monitor the economic impact of the standard given the number of small foundries that OSHA expects will be forced out of business. Courts have recognized the use of such "backstops" as legitimate regulatory tools. See, e.g., Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 657-58, 100 S.Ct. 2844, 2871-72, 65 L.Ed.2d 1010 (1980) (OSHA permitted to use monitoring and medical testing as "backstop" to assure adequacy of PEL); National Cottonseed Prods. Ass'n v. Brock, 825 F.2d 482, 486 (D.C.Cir.1987) ("backstop" was permissible to "check the validity of [OSHA's] assumptions in imposing the standard selected"), cert. denied, 485 U.S. 1020-21, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). Finally, a preliminary finding of technological infeasibility in documents prepared by OSHA's staff in 1983 does not undermine OSHA's later finding of feasibility. Apart from the fact that the 1983 documents never received formal agency approval, OSHA received and analyzed a considerable amount of additional information between 1983 and 1989, when it made its final determination of technological feasibility.
 
 2. Use of OSHA Case Files
 
 148
 ACMA claims that OSHA's technological and economic feasibility findings are undermined by OSHA's assertedly improper use of information from certain case files developed during OSHA inspections. First, ACMA points out that eight of fourteen case files used by OSHA in its supplemental rulemaking on small foundries concerned foundries with between twenty and thirty employees, even though OSHA drew the dividing line between large and small foundries at twenty employees. See 55 Fed.Reg. at 3148. OSHA responds that the case files on these eight foundries provided useful and reliable data because the foundries are only slightly larger than those with fewer than twenty employees and typically use the same technology and processes as small foundries. See id. at 3149. Rather than use data from only six foundries to determine the economic feasibility of the standard for small foundries, OSHA decided to include these additional foundries in its analysis as the next-best available evidence. The data bear out OSHA's assertion that conditions at these foundries are, in fact, similar to those at foundries with fewer than twenty employees. See id. at 3154. In the absence of any contrary showing by the industry, we cannot hold OSHA's use of this data unreasonable.
 
 
 149
 Second, ACMA charges that OSHA should not have used data from Foundry C because it uses alloys with little or no lead. As noted earlier, ACMA claims that Foundry C is the Prattville Castings Facility, and OSHA's data indicated that this facility was using significant amounts of lead in 1985, when most of the readings were taken. Nor is there merit in ACMA's claim that OSHA relied upon its own data on Foundry C while inconsistently downgrading a submission from Prattville Castings; this indicated nothing more than OSHA's dissatisfaction with the qualitative nature of the company's submission, which OSHA explained "contained little quantitative exposure data and complementary information to use for the purpose of characterizing employee exposures, technologies in place, or the engineering controls needed" to achieve compliance. 55 Fed.Reg. at 3148.
 
 
 150
 Third, ACMA claims that OSHA should not have used data from Company FF in determining economic feasibility because 60% of the metal poured by the company contained little or no lead. OSHA recognized, however, that some foundries poured primarily non-lead castings, and its economic feasibility analysis explicitly took this into consideration. See id. at 3163-64. ACMA also alleges that OSHA underestimated the company's costs of compliance because it estimated that the foundry would need between 72 and 215 cfm of ventilation, when in fact the foundry purchased 1,980 cfm of ventilation. The 72-215 cfm figure, however, referred not to the amount OSHA thought Company FF needed, but to the amount of ventilation the company actually was using at the time of the inspection. See id. at 3157.
 
 
 151
 Finally, ACMA asserts that OSHA used data from two other sources (the American Foundrymen's Society and Hill Air Force Base) inconsistently. OSHA asserts, and we agree, that the supposed inconsistencies reflect nothing more than its expert judgment that the information from these sources was reliable for some purposes but not for others.
 
 D. Conclusion
 
 152
 OSHA's finding of technological feasibility, based primarily on its analysis of exposure levels at two foundries within the industry, controls currently being used at these foundries, and further controls that could be implemented with modest efforts, is supported by substantial evidence. OSHA likewise has adequately demonstrated that a PEL of 50 ug/m[3] is economically feasible for large foundries and that a PEL of 75 ug/m[3] is feasible for small foundries. We therefore affirm both findings.
 
 VII. BRASS AND BRONZE INGOT MANUFACTURING
 
 153
 Brass and bronze ingots are produced by melting copper-bearing scrap in furnaces and casting the molten metal into ingots. Lead is often present in the scrap and is one of the alloying metals used to produce ingots according to customer specifications. The main sources of lead exposure are dust generated from cutting scrap into briquettes and fumes emitted during furnace operations and during the pouring of molten metal into ingot molds. Dust caused by scrap handling and preparation is a less serious source of lead exposure. See 54 Fed.Reg. at 29,150-51.
 
 
 154
 Ingots produced by brass and bronze ingot manufacturers provide raw material used by non-ferrous foundries, and, as noted in the previous section, the two industries were in fact treated as one during the initial rulemaking proceedings reviewed in Steelworkers. For the reasons discussed earlier, the Steelworkers court held "with very great reluctance" that OSHA had failed to prove that a PEL of 50 ug/m[3] was technologically feasible for foundries and ingot manufacturers. See Steelworkers, 647 F.2d at 1293. The question of economic feasibility was also left open on remand. See id. at 1294. Following OSHA's decision, with this court's approval, to analyze the industries separately for feasibility purposes on remand, the agency concluded in its July 1989 rulemaking that a PEL of 50
 
 
 155
 ug/m[3] was both technologically and
 
 
 156
 economically feasible for the brass and bronze ingot industry. See 54 Fed.Reg. at 29,156, 29,162.
 
 
 157
 The Brass and Bronze Ingot Manufacturers ("BBIM"), an industry association, challenges OSHA's economic feasibility finding on several grounds. Although BBIM also stated in a footnote in its opening brief that it "does not here concede the technological feasibility of OSHA's 50 ug/m[3] finding, particularly with respect to the briquetting, furnace, and cut-off saw operations," this court ordinarily refuses to consider issues raised in such a conclusory fashion. See Railway Labor Executives' Ass'n v. United States Railroad Retirement Bd., 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (declining to reach issue "on the basis of briefing which consisted of only three sentences in [petitioner's] brief and no discussion of the relevant statutory text, legislative history, or relevant case law"); see also Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983); Alabama Power Co. v. Gorsuch, 672 F.2d 1, 7 & n. 34 (D.C.Cir.1982) (collecting cases). Even assuming this does suffice to raise the technological feasibility issue, OSHA's findings appear more than adequate. Exposure data indicated that a majority of operations in the industry were already controlled below the 50 ug/m[3] level, see 54 Fed.Reg. at 29,151-53, and OSHA identified a number of additional controls, using existing technology and procedures, that could reduce exposures consistently to or below 50 ug/m[3] for all operations, with the possible exception of baghouse maintenance. See id. at 29,153-57. In the absence of any specific challenges to these findings, we cannot disturb OSHA's conclusion that the standard is technologically feasible for this industry.
 
 A. Economic Feasibility
 1. OSHA's Findings
 
 158
 The brass and bronze ingot industry consists of sixteen producers. OSHA estimated the costs of compliance based on the number of emission sources for a typical facility in the industry and the extent of controls already in place, concluding that the annual costs of compliance would be $181,000 per facility and $2.9 million for the industry as a whole. See 54 Fed.Reg. at 29,159-61. OSHA also found that the industry's ability to raise prices was constrained by the ability of some customers to process scrap themselves rather than purchase ingots. It therefore concluded that cost pass-through was unlikely and that the costs of compliance would have to be paid entirely or mostly out of profits. See id. at 29,161. An industry submission concurred in this assessment. See Ex. 582-85 at 23-24.
 
 
 159
 Information collected by the accounting firm Ernst & Whinney and submitted to OSHA by the industry showed that, for the period from 1983 to 1986, eleven of the sixteen producers in the industry suffered net losses every year except 1986, when there was a nominal net profit. See id., Attachment. OSHA considered the data to be of limited usefulness because the data were aggregated and therefore did not show "whether a few firms were doing very poorly or whether all firms were realizing very low rates of return." See 54 Fed.Reg. at 29,160. (In its brief to this court, OSHA criticizes the industry submission on the additional grounds that no data at all were presented for the other five industry producers and that no information was provided concerning the percentage of industry output represented by the eleven producers included in the submission.) OSHA then consulted Dun & Bradstreet's financial analysis for firms in SIC Code 3341, the code encompassing brass and bronze ingot manufacturers. This information indicated that the average return on sales for firms in SIC Code 3341 was 1.7% in 1987. Based on this, OSHA calculated that after-tax profits for the industry were approximately $5.7 million in 1987 and that the estimated annual compliance costs of $2.9 million would therefore amount to about 34% of industry profits (after taking account of the tax deductibility of those costs). Considering both the fact that the industry had been contracting and would continue to do so, but that the surviving companies likely would experience an increase in demand as a result, OSHA concluded that compliance costs of this magnitude would not threaten the industry's existence or structure. See id. at 29,160-62. It therefore determined that a PEL of 50 ug/m[3] was economically feasible for the industry.
 
 2. Industry Challenges
 
 160
 As even OSHA admits, the ingot industry's claim of financial distress is impressive. The evidence of distress cited by the industry includes the following: (1) evidence of severe contraction in the industry over the past several decades (at least thirty producers have left the industry since the 1950s, with thirteen ceasing production in the 1980s alone); (2) the 1982 conclusion of OSHA's first contractor, JACA Corporation, that the compliance costs of meeting a 50 ug/m[3] PEL would cause severe distress throughout the industry; (3) a conclusion reached by OSHA's Office of Regulatory Analysis in 1983, and a draft standard based on that conclusion, that a PEL of
 
 50 ug/m[3] was economically infeasible for
 
 161
 the industry; (4) statements in Meridian Research's August 1987 report on the industry indicating that the financial outlook for the industry was bleak; (5) the Ernst & Whinney data described above; and (6) Meridian's acceptance of the Ernst & Whinney data in a 1988 addendum to its earlier report and its conclusion that a 50 ug/m[3] PEL would increase industry concentration and would cause a profit erosion "impossible to sustain over the long run." See Ex. 582-85 (collecting evidence); Ex. 686D at 14 (Ernst & Whinney addendum).
 
 
 162
 OSHA's main responses to this array of evidence are its critique of the Ernst & Whinney data as being incomplete and presented in aggregate form, and its analysis of the industry's profit situation derived from the Dun & Bradstreet information described above. Although OSHA is correct in stating that it was not required to give substantial weight to conclusions based on flawed data, the Dun & Bradstreet data seem to suffer from flaws even more serious than those plaguing the Ernst & Whinney data rejected by OSHA. Most importantly, the Dun & Bradstreet data encompassed other industries in addition to brass and bronze ingot manufacturing. According to OSHA, Dun & Bradstreet's information was based on data from sixty firms, representing approximately 25% of the total number of firms in SIC Code 3341. See 54 Fed.Reg. at 29,160. Even assuming that all sixteen ingot manufacturers were among these sixty (and there is no indication that they were), ingot manufacturers comprised only 27% of the firms included in the database. By contrast, the Ernst & Whinney data, criticized by OSHA for including only eleven of the sixteen ingot producers, at least was based entirely on information from firms within the industry. Furthermore, although the Dun & Bradstreet data was categorized to show variations in profitability among firms in the lower, middle, and upper quartiles, this information was largely useless to OSHA given its inability to segregate ingot manufacturers from the remainder of the firms included in SIC Code 3341. OSHA's criticism of Ernst & Whinney's data for being unable to show variations in profitability applies with equal force, therefore, to the Dun & Bradstreet data relied upon by OSHA. Based on this apparently inconsistent handling of the evidence available to it, we conclude that OSHA has failed to demonstrate that it relied upon the best available evidence and, therefore, has not shown that a PEL of 50 ug/m[3] is economically feasible for the ingot industry.
 
 
 163
 OSHA asserted for the first time at oral argument that BBIM waived the arguments discussed above by failing to raise them in the rulemaking proceeding when Meridian Research relied on an earlier Dun & Bradstreet analysis of firms in SIC Code 3341 in making its initial assessment of economic feasibility in August 1987. We disagree. BBIM adequately raised the general issue of OSHA's use of such data when it challenged the accuracy of Meridian's analysis, arguing that the Ernst & Whinney data were more reliable. See Ex. 582-85 at 19 n. 7. Furthermore, BBIM had no way of foreseeing the inconsistent use OSHA would make of the 1987 Dun & Bradstreet data and the Ernst & Whinney submission in its July 1989 rulemaking. If anything, Meridian's acceptance of the Ernst & Whinney data in its 1988 addendum indicated that OSHA likely would take the industry's submission seriously.
 
 
 164
 BBIM also asserts that OSHA violated the notice and comment requirements of the Administrative Procedure Act ("APA"),5 U.S.C. Sec. 553 (1988), by relying on data (most importantly, the 1987 Dun & Bradstreet figures) that came into existence only after the close of the comment period. BBIM correctly points out that reliance on such evidence normally is improper. See Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 540-41 (D.C.Cir.1983); Kennecott Corp. v. EPA, 684 F.2d 1007, 1019 (D.C.Cir.1982). OSHA responds that a party objecting to an agency's use of such data must "indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity," Small Refiner Lead Phase-Down Task Force, 705 F.2d at 541 (citation omitted), which it claims BBIM has failed to do here. In fact, BBIM has provided such an indication, arguing that the Dun & Bradstreet data was less reliable than the Ernst & Whinney data supplied by the industry because it mainly encompassed companies outside the brass and bronze ingot industry. In light of the fact that, by OSHA's own admission, all other important evidence in the record at least suggested the economic infeasibility of a 50 ug/m[3] PEL, OSHA's reliance on the 1987 Dun & Bradstreet data without providing an opportunity for comment was improper. See id. (reliance on non-record data is reversible error where finding cannot be supported without it or where there is substantial likelihood rule would have been significantly changed had opportunity for comment existed).
 
 B. Conclusion
 
 165
 For the reasons given above, we vacate OSHA's finding of economic feasibility for the brass and bronze ingot industry and remand that portion of the record to OSHA for reconsideration. On remand, should OSHA once again consult the Dun & Bradstreet data or other, more accurate or current information not presently in the record, it must give the industry adequate notice that it intends to do so and provide an opportunity for the industry to respond.
 
 VIII. SUMMARY AND DISPOSITION
 
 166
 We affirm OSHA's findings on technological and economic feasibility for all of the industries currently before us, except its finding of economic feasibility for the brass and bronze ingot industry. Because that finding was not based on substantial evidence and was adopted in violation of the notice and comment requirements of the APA, we vacate the finding and remand that part of the record to OSHA for further proceedings consistent with this opinion.
 
 
 167
 This court's stay of section 1910.1025(e)(1) of the lead standard, which mandates compliance with the 50 ug/m[3] PEL by engineering and work practice controls, is hereby lifted with respect to the industries involved in this proceeding, with the exception of the brass and bronze ingot industry. For that industry, we continue to stay section 1910.1025(e)(1). The brass and bronze ingot industry will, however, remain subject to the requirement that it meet the 50 ug/m[3] PEL by some combination of engineering, work practice, and respirator controls during the course of the remand proceedings. See Steelworkers, 647 F.2d at 1311. We retain jurisdiction of the case and instruct OSHA to return the record on the economic feasibility of the standard for the brass and bronze ingot industry upon completion of its review on remand. Given the limited nature of the work that remains to be done, we expect that OSHA will act expeditiously in resolving the question of economic feasibility for this industry.
 
 
 168
 So ordered.
 
 
 
 *
 Chief Judge Mikva and Judge Wald co-authored Part I of the opinion. Judge Wald authored Parts II and III. Judge Silberman authored Parts IV and V. Chief Judge Mikva authored Parts VI, VII, and VIII
 
 
 [1]
 Ten of the "other industries" were treated individually in the first OSHA Preamble and therefore were not included in the general remand for "other industries." See id
 
 
 [2]
 Molten steel is produced in furnaces, poured into ladles, and then cast. The casting can be done either by the continuous casting process or by the teeming process. Both involve adding lead shot to the molten steel at the casting phase. There is only one producer that uses the continuous casting process. See 54 Fed.Reg. at 29,212. All other producers use the teeming process. OSHA treated the two processes separately in its feasibility analysis
 
 
 [3]
 AISI challenges OSHA's use of a geometric mean analysis for the leaded steel industry. Although OSHA reported geometric and arithmetic means, as well as a tabular distribution of the data points for the exposure levels, OSHA primarily relied on its tabular analysis, not a geometric mean analysis. See 54 Fed.Reg. at 29,212-13. For example, OSHA found that four out of seven monitoring samples for the crane operator were below 50 ug/m[3], and ten out of thirteen for the pourer were below 40 u g/m[3]. See id. at 29,212. OSHA used a tabular analysis because the distribution of the data points was linear, not logarithmic. Although the industry's challenge to the geometric mean analysis is not applicable to the leaded steel industry, we have found in general, as discussed infra, that it was reasonable for OSHA to rely on a geometric mean analysis when the data points were lognormally distributed.
 
 
 [4]
 OSHA was similarly justified in not considering "A Study of AISI Lead Exposure Data for 1987-1988" by David Neatrour (the "Neatrour Study"), submitted by AISI after the close of the record. The Neatrour Study compared the AISI data base with the LTV data base to show that they were not statistically different. However, the Neatrour Study failed to provide any further information regarding the conditions of the sampling (and other annotations) for the AISI data base
 
 
 [5]
 AISI also challenges OSHA's use of exposure level data to determine technological feasibility. AISI submitted medical evidence suggesting that OSHA's goal for blood lead levels (40 ug/m[3]) has already been met by the industry with existing controls. This court in Steelworkers, however, explicitly upheld "OSHA's conclusion that the lead standard should attempt to prevent excessive lead exposure at its source by measuring air-lead levels." Steelworkers, 647 F.2d at 1259. The Steelworkers court remanded to OSHA only the question of the standard's feasibility. AISI's challenge to OSHA's failure to consider blood lead level data, therefore, is not before this court.
 
 
 [6]
 The Standard Industrial Classification ("SIC") system is a categorization scheme devised by the Office of Management and Budget commonly used in developing industry economic profiles
 
 
 [7]
 No profit data specific to leaded steel operations were made available to OSHA; however, OSHA determined that the leaded steel product constituted only about 0.8% of the total sales. See id. One leaded steelmaking producer reported losses of $13,161,000 in 1987, and the costs of compliance represent between 2.9% and 5.6% of those losses; one other leaded steel producer reported losses of $31,000,000 in 1987, and the costs of compliance would be between 1.2% and 2.4% of those losses. See id. Because the steel industry is already absorbing the losses of the leaded steelmaking operations, and the costs of compliance are only a small percentage of the total losses, OSHA determined that the overall impact of the costs would be small and that the producers of leaded steel would not choose to shift away from the leaded steel product simply because of those costs. See id
 
 
 [8]
 Only 15% of all of the lead oxide produced is currently manually packaged in customer specified paper bags and drums; the other 85% is packaged in bulk, using automated packaging. See id. at 29,179, 29,183; Ex. 684B at 3. LIA concedes that bulk shipping is the principal means of shipment in the industry. See Ex. 582-90 at 13
 
 
 [9]
 These samples were taken at Plant A in 1987 and are the most recent data available. The two job classifications that did not achieve a geometric mean of 50 ug/m[3] were the packagers and the oxide operators. The geometric means for those two job classifications were 65 ug/m[3] and 62 ug/m[3] respectively. See id. at 29,176.
 
 
 [10]
 The industry's "business strategy" claim is really a challenge to the economic feasibility of the lead standard. If, as the industry claims, consumers require manually measured specialized packaging, and the industry loses that portion of the lead chemicals business to foreign competitors who can provide those specialized services, then OSHA must determine if the market loss would threaten the current competitive structure or the existence of the industry. See id. at 1272. We will consider OSHA's economic feasibility determination in this regard below
 
 
 [11]
 For example, in Plant A in 1987, 60% of the thirty-one samples for maintenance workers were below 50 ug/m[3], and thus the majority of the samples met the PEL. But the arithmetic mean was 152 ug/m[3] because one sample was unusually high at 1715 ug/m[3]. This kind of extremely high, atypical exposure level is caused by unusual events such as operation upsets and spills, or monitoring problems. By comparison, the geometric mean for the same set of samples was 22 ug/m[3]. See 54 Fed.Reg. at 29,177. Because the data points for exposure levels are typically lognormally distributed, the baseline of zero limits the possibility that there will be abnormally low data points skewing the mean; on the other hand, there is no ceiling to the abnormally high data points, which, if averaged arithmetically, will always skew the mean to be too high. OSHA determined, therefore, that the geometric mean, which discounts the abnormally high samples, more accurately reflected routine exposure levels in this industry, as in most others. See id.
 
 
 [12]
 This figure includes both annualized capital costs and annual equipment operation and maintenance costs
 
 
 [13]
 Post-compliance rate of return on sales would be 2.5% for old plants, 3.2% for relatively new plants, and 4.5% for new or modernized plants. See id. at 29,194. We note here that the industry group did not challenge OSHA's findings regarding impact on profits, or OSHA's determination regarding the ability of the industry to absorb the costs of compliance. We address the industry's sole challenge to the economic feasibility analysis below--that OSHA's estimate of compliance costs was too low because the estimate did not include the costs of complete conversion to automated bulk packaging
 
 
 [14]
 These companies are now considered a part of the secondary lead smelting industry, which is not a party to this proceeding. Their success in meeting the PEL appears to vindicate OSHA's belief that the standard is indeed feasible. See 54 Fed.Reg. at 29,164-65
 
 
 [15]
 ISRI raises a number of challenges regarding the independent battery breakers which also concern the copper smelters and are dealt with in the copper smelters section of this opinion
 
 
 [16]
 Of course, the high variability might also be explained by factors intrinsic to the particular company, such as the end of major investment expenditures in the 1986 fiscal year, but petitioner does not take issue with the finding that the industry's profit level is highly variable
 
 
 [17]
 It is not obvious to us why OSHA, after repeated claims that the geometric average offers a superior tool for estimating the exposure levels, lapses into using the arithmetic average here. Since this issue is not raised by ISRI, we need not consider the suitability of the arithmetic average
 
 
 [18]
 OSHA further argues that USMRC was part of a larger industrial conglomerate and that the conglomerate had decided that it "might well seek better investment opportunities in another sector" because of the depressed condition of the industry. The business organization to which the facility belongs cannot, however, be important for economic feasibility determinations. If managers of a large conglomerate find that continuing the operations of a subsidiary is likely to result in subnormal profits, then it is equally likely that an independent facility with the same costs will come to the same conclusion and also close the facility. Indeed, it can be argued that a large industrial company is less likely to close a plant down because its economies of scope and scale yield lower costs of production
 
 
 [19]
 We note ISRI's claim that a member of Meridian's team, a Ph.D. candidate, was unqualified for the task because he was "a philosophy student." Philosophy and metallurgy, to be sure, are fairly different disciplines, compare C. Mantell, Tin: Its Mining, Production, Technology and Applications and D. Adriano, Trace Elements in the Terrestrial Environment with Aristotle, Nicomachean Ethics. But not all Ph.D. candidates study philosophy--the team member's specialty was natural resource economics, which clearly was relevant to the team's mission. ISRI's argument is silly